FOR IMMEDIATE NEWS RELEASE                          NEWS RELEASE #011

FROM: CLERK OF SUPREME COURT OF LOUISIANA


The Opinion handed down on the **26th day of February, 2016**, is as follows:


**BY JOHNSON, C.J.**:


2014-KA-0402          STATE OF LOUISIANA v. ROBERT GLEN COLEMAN (Parish of Caddo)

                      Retired Judge Marion F. Edwards, assigned as Justice ad hoc,
                      sitting for Crichton, J., recused.

                      For the reasons assigned, defendant's conviction for first degree
                      murder is affirmed. Defendant's sentence of death is vacated and
                      set aside and the case is remanded to the district court for a
                      new sentencing hearing.

                      CONVICTION AFFIRMED; DEATH SENTENCE REVERSED; CASE REMANDED FOR
                      FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

                      CRICHTON, J., recused.
                      KNOLL, J., additionally concurs and assigns reasons.
                      WEIMER, J., dissents in part and assigns reasons.
                      GUIDRY, J., dissents in part for the reasons assigned by Justice
                      Weimer.
                      CLARK, J., dissents in part for reasons assigned by Justice
                      Weimer.

SUPREME COURT OF LOUISIANA

NO. 2014-KA-0402

STATE OF LOUISIANA

VERSUS

ROBERT GLEN COLEMAN

ON APPEAL
FROM THE FIRST JUDICIAL DISTRICT COURT
FOR THE PARISH OF CADDO

**JOHNSON, Chief Justice**[*]

On February 14, 2003, a Caddo Parish grand jury returned an indictment

charging defendant, Robert Glen Coleman, with the January 1, 2003, first degree

murder of 70-year-old Julian L. Brandon, Jr. and the attempted first degree murder of

his wife, 69-year-old Alice Brandon. Counsel was appointed and defendant entered

a plea of not guilty. On January 21, 2005, the state filed an amended indictment,

severing the non-capital offense, and proceeded to trial on one count of first degree

murder as to decedent Julian Brandon.[1] On February 17, 2005, a Caddo Parish jury

returned a unanimous verdict of guilty as charged, and, two days later, voted

unanimously to impose the death penalty, having found all four aggravating

circumstances urged by the state, namely that: defendant was engaged in the

perpetration or attempted perpetration of an armed robbery, La. C.Cr. P. art.

905.4(A)(1); the victim was older than 65 years of age, La. C.Cr. P. art. 905.4(A)(10);

---

[*] Retired Judge Marion F. Edwards, assigned as Justice ad hoc, sitting for Crichton, J., recused.

[1] The state separately tried co-defendant Brandy A. Holmes. In February 2006, a Caddo Parish jury found her guilty of the first degree murder of Julian Brandon and unanimously sentenced her to death. *State v. Holmes*, 06-2988 (La. 12/2/08), 5 So. 3d 42, *cert. denied, Holmes v. Louisiana*, 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed. 2d 233 (2009).

1

defendant created a risk of death or great bodily harm to more than one person, La. C.Cr. P. art. 905.4(A)(4); and defendant had been previously convicted of armed robbery, La. C.Cr. P. art. 905.4(A)(3). On appeal, this court found a violation of the rule in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986), which forbids racially discriminatory use of peremptory challenges during jury selection, and vacated defendant's conviction and sentence and remanded the case for a new trial. *State v. Coleman*, 06-0518 (La. 11/2/07), 970 So. 2d 511.

Jury selection for defendant's second trial commenced on January 23, 2012, and the guilt phase began on January 30, 2012. On February 3, 2012, a Caddo Parish jury returned a verdict of guilty as charged, and on February 7, 2012, having found the same four aggravating circumstances as found at his first trial, unanimously agreed to impose the death penalty. Thereafter, the trial court denied defendant's motion for a new trial and, on May 3, 2012, formally imposed the death sentence in accord with the jury's determination.

This is a direct appeal under La. Const. art. V, § 5(D). Defendant appeals his conviction and sentence raising 38 assignments of error, variously combined into 21 arguments. We will address the most significant of these assignments of error in this opinion, and the remaining assignments of error will be addressed in an unpublished appendix. After a thorough review of the law and the evidence, we find no merit in any of the assignments of error relative to the issue of guilt. Therefore, we affirm the defendant's first-degree murder conviction. However, we find error relative to the state's failure to provide sufficient notice of evidence of an unadjudicated murder introduced in the penalty phase. Thus, we vacate defendant's sentence and remand this case for a new sentencing hearing.

**FACTS**

2

During the early evening hours of January 1, 2003, 70-year-old retired minister, Julian Brandon, and his 68-year-old wife, Alice Brandon, were attacked in their home. Crime scene investigators determined that the perpetrators shoved their way into the Brandon home through the front door and that Mr. Brandon was forced into his dining room where he was shot through the chin at contact or near-contact range. A portion of the bullet lodged in his brain and a portion exited and embedded in the ceiling above him. Mr. Brandon was repeatedly stabbed and cut at some point thereafter. Mr. Brandon was killed in the attack. Mrs. Brandon was found in a bedroom of the home, where the perpetrators had placed a pillow over her face and shot her in the head. Mrs. Brandon survived the attack, although she remained permanently disabled until she died several years later.

Months earlier, Tammy Holmes was living with her husband, John Holmes, in Tylertown, Mississippi.[2] In August 2002, John's daughter, Brandy Holmes, stayed with the couple a short time before moving in with her new boyfriend, defendant Robert Coleman. During that time, John owned a .380 pistol which he used regularly to target shoot in a remote wooded area in Lumberton, Mississippi. Brandy and defendant visited John and Tammy just before Christmas in 2002. While at their home, defendant stayed outside to work on his truck, but Brandy made several trips back and forth between the yard and the home, using a back door near the nightstand on which John kept his gun. The day after their visit, John noticed his gun was missing and, despite exhaustive searches, never located it.

On Christmas Eve 2002, defendant and Brandy left Mississippi to visit Brandy's mother, Brenda Bruce, in Shreveport. After settling in at Ms. Bruce's trailer home, the pair decided to host a New Year's Eve party. Terrance Barnes, an acquaintance of Brandy's, attended the party and, at some point during the night,

---

[2] John Holmes is now deceased, but his testimony at defendant's first trial was published to the jury at this trial by agreement of the parties.

observed defendant receive a gun, which Barnes described as a "revolver," from Brandy's younger brother, Sean George, in a back bedroom. Later that night, defendant asked Barnes if he knew where he could "hit-a-lick," which Barnes understood to mean that defendant was asking where he could rob someone.

The Brandons were not discovered for four days, on January 5, 2003, when a concerned friend, Calvin Hudson, went to check on them. Mr. Hudson observed Mr. Brandon's body in a pool of blood through the glass back door of the house and immediately went to a neighbor's house to call police. While waiting for police to arrive, the neighbor, retired Caddo Parish Deputy Sheriff Danny Kent, walked over to observe the scene for himself. Deputy Kent found the Brandons' back door unlocked and entered to check Mr. Brandon's pulse. Deputy Kent maintained he did not touch anything in the home - except to check Mr. Brandon's pulse - and that police arrived shortly thereafter and secured the scene.

Sergeant William Gaines was first to respond to the 911 dispatch and also entered through the back door. According to Sgt. Gaines, it was apparent that Mr. Brandon had been dead more than a day. After surveying the scene around Mr. Brandon, Sgt. Gaines followed bloody footprints down the hallway where he heard a sound coming from the first bedroom and discovered an incapacitated Mrs. Brandon. There was a bloodstain on the bed and Mrs. Brandon was lying face up on the floor in a pool of dried blood. Sgt. Gaines notified Mrs. Brandon that he was a police officer there to help, called for EMT assistance, and cleared the remainder of the house. According to Sgt. Gaines, although it seemed Mrs. Brandon wanted to say something, she could not speak and her eyes could only track from side to side. Sgt. Gaines waited for investigators to arrive and photograph the scene before moving anything, but noted a jewelry box in disarray and a piece of jewelry on the kitchen floor. After Mrs. Brandon received initial medical attention from the EMTs, Sgt. Gaines recalled

that she was able to answer simple questions, but he did not hear her say anything of significance to the investigation.

Deputy Chief Jefferson Akes of the Caddo Parish Sheriff's Office was another among the first to respond. Having observed that Mrs. Brandon had suffered a head wound of indeterminate cause, he immediately dispatched emergency air transport. Deputy Chief Akes also recalled that although she was initially unresponsive, Mrs. Brandon began to mumble after EMTs cleaned her mouth but she was unable to give specific responses.

The flight medic crew arrived at the scene to transport Mrs. Brandon to the hospital. While on board the helicopter, paramedic Tommy Adams questioned Mrs. Brandon about her attackers and she stated that two white persons were responsible.[3] Mrs. Brandon was admitted into intensive care and remained there several weeks. She had a "trach" implanted shortly after being admitted and never spoke again.[4] After Mrs. Brandon was discharged from the hospital, her daughter, Dawn Finley, a nurse, provided round-the-clock care until Mrs. Brandon passed away in 2008.

Crime scene investigator Corporal Charlotte Hammontree arrived at the Brandons' home shortly after the 911 dispatch and immediately began taking photographs of the scene. She also collected several samples for DNA testing and documented everything of apparent significance. In addition, she noted the absence of spent bullet casings on the premises. Mr. Brandon's wallet, debit and credit cards, along with at least four pieces of Mrs. Brandon's jewelry - including a pearl bracelet and a gold bracelet with multicolored stones - were missing. Latent prints expert, Lt.

---

[3] Adams was deceased by the time of defendant's second trial. A transcript of Adams' testimony at defendant's first trial was published to the jury. In a written addendum, also published to the jury, Mr. Adams stated, in pertinent part: "I asked her if she knew what happened to her? She stated yes. I asked was she assaulted, she said yes. I asked her did someone enter their home she said yes. I asked her if they were white, black or Hispanic. She said white. I asked her if there was more than one. She said yes two."

[4] After the attack, Mrs. Brandon could only nod or shake her head in response to questions, and even that yielded inconsistent information about her attackers.

Owen McDonnell, brushed five or six areas at the scene for fingerprints, including the knife blades used on Mr. Brandon and the killers' apparent points of entry and exit, but none of the fingerprints lifted at the scene were matched with any person of interest. On the door leading to the garage, however, detectives documented an area of dried blood containing a small diamond pattern.

After securing and surveying the Brandon home, Caddo Parish investigators gathered information which led them to suspect that Brandy, Sean, and a third person named Johnny Wright were involved. Captain Bobby Abraham, Sergeant Gary Frake, Lieutenant Bill Duncan, and lead investigators Sheila Hostnick and Kay Ward, traveled to the Bruce trailer to locate Brandy and Sean. Ms. Bruce allowed the officers inside, where they encountered Brandy, Sean, and defendant, along with Ms. Bruce's three young grandchildren. Defendant was first observed in a rear bedroom, where he was not wearing shoes. Brandy, defendant, Sean, and Ms. Bruce voluntarily accompanied officers to the station for interviews. When asked to come along to the station, defendant proceeded to put on a pair of black boots that had been on the floor right next to him. Brandy and defendant were taken in separate cars, and Sean, who was a minor, went with his mother. Defendant, who was not yet a suspect, traveled unrestrained in the front seat of Capt. Abraham's car. Upon arrival at the station, Capt. Abraham directed defendant to take a seat in the conference room while Brandy was taken into an interview room.

After defendant indicated he understood his rights and signed a written waiver, Det. Ward and Deputy Hostnick interviewed him at 11:20 p.m. Defendant told the officers he had no knowledge of the murder, he and Brandy had been boyfriend and girlfriend just a few months, he came with her to Shreveport just before Christmas, and they had been inseparable since their arrival. Defendant then returned to the conference room. Some time thereafter, defendant asked to speak with Capt.

Abraham. Capt. Abraham brought defendant into his office and the two spoke alone. Defendant inquired as to "what was going on," and repeated that he did not know anything about the homicide. He volunteered further that he did not believe Brandy was involved either, stating again that they had been at each other's sides since arriving in Shreveport on December 24, 2002. During the conversation, Capt. Abraham observed a "fresh injury" on defendant's right hand, which defendant claimed he sustained while working on a bicycle.[5] Defendant agreed to have his hands photographed and then asked to step outside for a cigarette. Capt. Abraham agreed and accompanied him. After the cigarette, defendant returned to the conference room.

Capt. Abraham did not record defendant's initial statements because, in his experience, a recording device generally tends to keep a subject from speaking openly, but Capt. Abraham verified that each of defendant's pre-arrest statements were voluntary.[6] Defendant appeared lucid, relaxed, and extraordinarily calm while at the station.

Lt. McDonnell subsequently observed what appeared to be blood on defendant's boots and, when he advised defendant as much, defendant claimed the boots were not his but actually belonged to Brandy's brother, Sean. Up until that point, defendant had not said anything to indicate the boots belonged to anyone else. Lt. McDonnell and Capt. Abraham recognized that the soles of defendant's boots were similar to prints at the crime scene and collected his boots along with the other interviewees' shoes. Defendant voluntarily relinquished his boots with the disclaimer that they were his only shoes and that he "wouldn't be stupid enough to walk into a

---

[5] Neither Brandy, Sean nor Johnny Wright had cuts on their hands.

[6] According to Capt. Abraham, he never threatened defendant nor promised him anything. At no point before his arrest did defendant request an attorney or decline to answer questions.

police station with blood on [them]." To keep defendant from going barefoot, officers loaned him a pair of rubber boots used by inmates during cleaning.[7]

After analyzing the subjects' shoes, Lt. McDonnell determined that although Brandy could be excluded as a source of the bloody footprints, defendant could not be excluded. Defendant's boots shared the same tread detail, size (nine), and shape as the print Lt. McDonnell lifted at the crime scene.

Meanwhile, Deputy Hostnick separately interviewed Brandy. At some point, Deputy Hostnick stepped away and a male officer granted Brandy permission to use the restroom unaccompanied. Shortly thereafter, Deputy Hostnick discovered that Brandy took the opportunity to remove three cassette tapes from the interview room, pull all the tape out, and flush the jewelry she had been wearing down the toilet. Brandy was arrested at 10:00 a.m. on January 6, 2003.

Sometime after defendant gave his boots to detectives, but apparently before they realized he could not be ruled out as the source of the bloody footprints at the scene, Det. Jason Morgan drove defendant back to the Bruce trailer.[8] On the way, defendant again sat in the front seat and, as he exited the vehicle, returned the rubber boots he was loaned at the station. Defendant entered the Bruce trailer wearing only socks on his feet and Det. Morgan left to return to the station. By the time Det. Morgan traveled 200-300 yards, however, he received a call advising him to reclaim defendant. When Det. Morgan arrived back at the trailer, less than two minutes later, the door to the trailer was open and defendant met him at the doorway with a duffle bag, still not wearing any shoes. Det. Morgan informed defendant he was needed back

---

[7] Lt. McDonnell testified that defendant willingly handed over the shoes but stated these were the only shoes he owned. Capt. Abraham testified defendant agreed to hand over his shoes to investigators, but stated he did not have any other shoes to wear at that time.

[8] Deputy Hostnick released defendant in accordance with policy because she was unaware at the time there existed any evidence inculpating him, other than the cut on his palm for which he had provided an explanation.

at the station for additional questioning. Defendant agreed, but stated he needed to get to the bus station afterwards. Det. Morgan gave defendant the rubber boots to wear back to the station.

Upon returning to the station, defendant gave his consent for the detectives to search his duffle bag. The bag contained clothing, but no shoes. Defendant identified certain items in the duffle bag as his belongings, including a pair of jeans on which blood evidence connected to the unrelated homicide of Terrance Blaze was later found.

Defendant was subsequently placed under arrest for the murder of Julian Brandon. After his arrest, defendant was transferred to the Caddo Parish Correctional Center where he was temporarily placed in an intake cell with Collies Sharpes and Bobby Evans, each of whom had recently been arrested on separate charges. None of the three knew each other before being placed together in the cell. Defendant made statements to Sharpes and Evans indicating his involvement in the crime. After defendant was removed from the intake cell, either Sharpes or Evans called a guard over and divulged what defendant had said. The following day, Sharpes and Evans separately gave recorded statements to Caddo Parish Detective Marianna McClure.

Sharpes testified that during his brief encounter with defendant, defendant volunteered that he had been arrested for murdering an "old couple up in Blanchard." According to Sharpes, defendant stated he instructed his girlfriend Brandy to "knockoff" the couple to see whether she had what it took to kill and he had taken a bracelet from the victims during the crime. Sharpes testified that defendant said Brandy did the killing and attempted to cover her tracks by flushing some of the victim's jewelry down the toilet at the police station. Defendant boasted police "didn't have anything on him," and informed his cellmates that he was from Mississippi. In Sharpes' appreciation, defendant was excited as he spoke about the crime: his eyes

brightened and he appeared gratified and proud of what he said he and Brandy had done together. Sharpes testified he had not received anything for his testimony, he has never been an agent of the state, he did not receive information about the crime from law enforcement, and although he had access to a television in jail he did not see any related news reports.[9]

Cellmate Bobby Evans also testified about his encounter with defendant. At defendant's second trial, Evans, who was still incarcerated and a self-described "four-time loser," became uncooperative. When called to the stand, he acknowledged his prior testimony recounting defendant's January 6, 2003, statements but balked when asked to relay them again. After a combative exchange with the prosecutor, Evans explained he had initially disclosed defendant's statements only because he was "young and scared," but he no longer wanted anything to do with defendant's case because he still had time left to serve and was worried he might meet defendant again behind bars. After having his memory refreshed as to the content of his prior testimony, Evans confirmed that, on January 6, 2003, defendant stated he and his girlfriend Brandy killed "two old people;" defendant was putting Brandy to a test; Brandy flushed the victim's bracelet down the toilet; defendant had blood on his shoes; defendant buried the murder weapon behind the victims' home; Brandy's brother was present during the murder; Brandy's brother wore defendant's shoes and defendant wore someone else's shoes, to "throw people off;" Brandy shot the woman and defendant shot the man; a detective released defendant back to Brandy's "mama's house," but came back for him; the "old man" hit Brandy with a Budweiser bottle; and they had tied up the victims. Evans denied that detectives had supplied him with any

---

[9] Attorney Pam Smart was appointed to represent both Evans and Sharpes on the charges they were facing when defendant made the jail cell disclosures. Smart testified she never reached any plea deals on behalf of Evans or Sharpes in consideration for their testimony against defendant. According to Smart, the treatment each received was representative of dispositions she has obtained for similarly situated clients.

information about the crime and stated he had not seen or heard anything about it on the news. On cross-examination, it was elicited that Evans told Detective McClure defendant's skin tone was "really white," and that when Evans testified before the grand jury he stated, contrary to his trial testimony, defendant said Brandy shot the man and defendant shot the woman.

Investigators determined that neither Sean George nor Johnny Wright were involved in the Brandon murder. On the day of the murder, Sean was subject to a court order which required him to stay within 150 feet of his mother's trailer and was wearing an ankle bracelet that monitored his whereabouts. After speaking with Sean's probation officer, investigators ruled him out as a suspect. Separately, investigators independently verified Wright's alibi through multiple sources.

On the evening of the murder, January 1, 2003, surveillance cameras captured two individuals attempting to use the ATM at the Northwood Branch of the Hibernia National Bank in Shreveport, between 7:32 and 7:36 p.m. While the ATM could not record which card, i.e., which bank account was attempted to be accessed or whose card was inserted, electronic bank data showed the users inserted a card and supplied an incorrect PIN. Brandy's father, John Holmes, reviewed enhanced ATM surveillance imagery and identified Brandy as the female and testified the black male with her looked like defendant. Tammy Holmes, Brandy's stepmother, identified Brandy and defendant in the same photograph. At 6:55 p.m. and 7:01 p.m. on the same evening, the bank also recorded two separate failed attempts to withdraw $200 using Mr. Brandon's ATM card from an ATM inside a convenience store near the Brandon home. The withdrawals were declined for use of an incorrect PIN. There was no surveillance camera at this ATM. Testimony established that it was an easy walk from the Bruce trailer to the Brandon home and to both of these ATM locations.[10]

[10] The distance between the Bruce trailer and the Brandon home was less than one quarter of a mile.

After Brandy and defendant were arrested, investigators obtained warrants to search in and around the Bruce trailer. In the bedroom Brandy and defendant shared, investigators found two pillows with apparent bullet holes, similar to the one found near Mrs. Brandon, and a box of plastic food prep gloves from a Subway restaurant. The gloves had a small diamond pattern which was consistent with the diamond pattern imprinted in the dried blood stain found on the Brandons' door. Outside the trailer, just beyond the porch, there was a bottle of bleach and a "little burn pile" of charred clothing, a mop, a shoe sole, and other fabric. Three spent shell casings and a clear plastic glove which contained a pearl bracelet and a gold bracelet with multicolored stones were recovered from a gutter along the roof.

Investigators also traveled to Lumberton, Mississippi to investigate a link between Brandy and the weapon used to shoot the victims. With the help of John and Tammy Holmes and local law enforcement, investigators located the spot where John used his .380 handgun for target practice. Caddo Parish authorities excised a portion of a pine tree that had been hit by gunfire and collected spent shell casings from the ground nearby. Lt. McDonnell extracted a bullet from the tree sample and submitted it for lab analysis.

Forensic analyst and ballistics expert Richard Beighley compared the bullets and spent shell casings and concluded that: (1) the portion of the bullet extracted from Mr. Brandon's brain fit with the fragment embedded in the ceiling above him; (2) the bullet extracted from the Mississippi pine tree was fired by the same weapon, a .380 caliber, that shot Mr. Brandon; (3) the same weapon fired at least one of the bullets that yielded the shell casings recovered from the gutter at the Bruce trailer;[11] and (4)

---

[11] The bullets that yielded the other two spent shell casings recovered from the gutter were also fired from a .380 caliber with the same "class characteristics" as the weapon used to shoot Mr. Brandon but could not be conclusively matched. "Class characteristics" refer to the shape, size, location, overall markings, weight, design, quantity of lands and grooves, and width of lands and grooves of a bullet and its spent casing.

the shell casings collected from around the pine tree in Mississippi were from the same .380 caliber weapon that produced the casings recovered from the gutter at the Bruce trailer. According to Beighley, that two of the casings from the gutter were unable to be conclusively matched with the other ballistics evidence was attributable to the fact that a .380 caliber is an inexpensive gun that variably fires with less force than is necessary to leave unique impressions on the bullet or its casing.

As to blood at the scene, DNA testing revealed that blood on the knives contained Mr. Brandon's DNA and none of defendant's DNA was detected. DNA testing of bloodstains on defendant's boots, however, revealed the presence of Mr. Brandon's DNA, with a statistical probability that it came from someone other than Mr. Brandon of one in 208 trillion. One of the shell casings recovered from the gutter at the Bruce trailer also tested positive for Mr. Brandon's DNA, with a statistical probability that it came from someone else of one in 2.26 billion.

Defendant asserted he was innocent and presented his case that he was never inside the Brandon home, the perpetrators were two white people, as Mrs. Brandon told paramedic Tommy Adams, and the shoes he wore to the police station belonged to Sean George. In support of his theory, defendant called his younger brother, Bradley Brumfield to testify. According to Brumfield, while defendant lived near him in Tylertown between 2000 and 2002, they were roughly the same size and had a habit of sharing clothing and shoes, specifically size 10.5 or 11 shoes. Brumfield stated that he had never seen defendant wearing the size 9 boots in which he was arrested. Brumfield also stated that, the day before defendant left for Shreveport, he was helping him work on his truck's transmission and defendant cut the palm of his right hand. Brumfield also recalled that when he visited defendant in jail, defendant denied any involvement in the murder and blamed Brandy for his entanglement in the case.

Mike Brandao, a nurse practitioner who responded with paramedic Tommy Adams to transport Mrs. Brandon in the medivac helicopter, also testified. According to Brandao, Mrs. Brandon was alert enough to physically respond while on the helicopter, i.e., squeeze a hand; although, as a result of the excessive aircraft noise and the helmet he was required to wear, Brandao did not hear anything that Mrs. Brandon may have said to Adams. Brandao explained that, as a result of the noise, it is generally difficult for medical personnel to understand patients on board the helicopter.

During the penalty phase of the proceedings, following the jury's return of the guilty verdict, the state presented evidence of defendant's involvement in the unrelated murder of Terrance Blaze. The evidence indicated defendant and Brandy committed the murder together in Brandy's mother's vehicle three days after the Brandon murder. The state also presented victim impact evidence concerning how the crime affected the Brandons' friends and family. The defense offered mitigation evidence in an effort to establish defendant's intellectual disability/mental retardation. The defense also offered evidence to show he had a difficult childhood.

The jury was unpersuaded by the mitigation evidence and unanimously determined a sentence of death should be imposed.

## DENIAL OF MOTION TO SUPPRESS FRUITS OF ILLEGAL DETENTION
### (Assignment of Error #1)

Defendant filed a motion to suppress evidence and statements that were obtained from him the night of January 5, 2003, and the morning of January 6, 2003, arguing that the evidence and statements resulted from an illegal detention, and that his intellectual deficits prevented him from knowingly and voluntarily consenting to the waiver of any of his rights. Specifically, defendant sought to exclude his boots,

14

photos of his boots, photos of his hands, two buccal swabs, his fingerprints, fingernail scrapings, his duffle bag and its contents, along with his statements that he had been with Brandy Holmes since his arrival in Shreveport, that the boots he was wearing were his only shoes, and that he was not stupid enough to walk into the station with blood on his shoes. Defendant takes issue with the means by which officers procured him and argues the Fourth Amendment proscribes his removal from a private residence and prolonged detention without probable cause. Defendant asserts the trial court should have granted his motion to suppress because he did not voluntarily consent to go to the station or to the collection of his personal effects. Instead, defendant claims he acquiesced only as a result of the officers' coercive tactics, coupled with his sub-average intellect and intoxicated state.

An arrest is "the taking of one person into custody by another [through] actual restraint [that] may be imposed by force or may result from submission of the person arrested to the custody of one arresting him." *State v. Fisher*, 97-1133 (La. 9/9/98), 720 So. 2d 1179, 1183; La. C.Cr. P. art. 201. Whether a person has been arrested is determined by an objective test; neither the person's subjective impression nor the lack of formality of the arrest resolves the issue. *State v. Thibodeaux*, 414 So. 2d 366, 368 (La.1982). The determination of whether an arrest occurred depends on the totality of the circumstances, but several factors distinguish an arrest from lesser infringements on personal liberty. *State v. Allen*, 95-1754 (La. 9/5/96); 682 So. 2d 713, 719. A prime characteristic of any Fourth Amendment seizure of a person is whether, under the totality of the circumstances, a reasonable person would not consider himself or herself free to leave. *Id*. Ultimately, whether a person has been arrested depends on circumstances indicating an intent to impose an extended restraint on the person's liberty. *Id*.

We agree with the trial court's finding that the interaction between defendant and the detectives does not meet the definition of an arrest or a detention. At the suppression hearing, defendant testified he only went along to the station because he felt intimidated. He testified that when he was summoned from Brandy's bedroom, Deputy Hostnick unsnapped her holster in an overt show of force and directed him to come along. In contrast, Deputy Hostnick denied ever unstrapping her holster in defendant's presence, either as a show of authority or otherwise. She stated she made no attempt to use or display her weapon and explained such an act would have been out of character, especially given that she was trained to never unstrap her holster unless she intended to use her weapon. Deputy Hostnick testified further that, at no point before defendant was arrested on the morning of January 6, 2003, did she ever tell him he had no choice but to comply. According to Deputy Hostnick, and as Detective Ward independently attested, if defendant had simply said, "I'm not going with you," when they initially approached him inside the Bruce trailer, the officers would have left without him because they lacked probable cause to detain him at that time. As Detective Ward recalled, defendant was cooperative and did not express any unwillingness to go to the station. In Detective Ward's view, it appeared defendant came along, at least in part, because Ms. Bruce made it clear she did not want him left unattended with her grandchildren.

In ruling on the motion to suppress, the trial court weighed these differing accounts and found defendant voluntarily cooperated and the circumstances did not rise to a level constituting arrest or detention. The trial court reasonably rejected defendant's assertion that he went along to the station because Deputy Hostnick unsnapped her holster threateningly, in light of Deputy Hostnick's contrasting testimony denying the allegation. There is no showing that the court unreasonably credited Deputy Hostnick's testimony. Detective Ward's independent testimony

corroborated Deputy Hostnick's statements indicating that at no point was defendant told he was required to comply with officers' requests. Defendant was not handcuffed or otherwise forcibly restrained. He was not placed in the back of the police vehicle to be taken to the station. Rather, defendant voluntarily rode to the Sheriff's office with Captain Abraham as a front seat passenger. Based on this testimony, the trial judge reasonably determined defendant was not removed from the trailer against his will and was therefore not taken into custody at that time.

The United States and Louisiana Constitutions protect against unreasonable searches and seizures. U.S. Const. amend. IV; La. Const. art. 1, § 5. If evidence is derived from an unreasonable search or seizure, the proper remedy is exclusion of the evidence from trial. *Mapp v. Ohio*, 367 U.S. 643, 648, 81 S. Ct. 1684, 1688, 6 L.Ed. 2d 1081 (1961); *State v. Tucker*, 626 So. 2d 707, 710 (La.1993). A search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions. *State v. Thompson*, 11-0915 (La. 5/8/12), 93 So. 3d 553, 574. One of these exceptions is consent. *Id.* The state has the burden of proving the consent was given freely and voluntarily. *Id.* Voluntariness is a question of fact to be determined by the trial judge under the facts and circumstances of each case. These factual determinations are to be given great weight on appellate review. *State v. Edwards*, 434 So. 2d 395, 397 (La. 1983). The state bears the burden of proving the admissibility of the evidence seized without a warrant when the legality of a search or seizure is placed at issue by a motion to suppress evidence. La. C.Cr. P. art. 703(D). Trial courts are vested with great discretion when ruling on a motion to suppress. Consequently, the ruling of a trial judge on a motion to suppress will not be disturbed absent an abuse of that discretion. *State v. Long*, 03-2592 (La. 9/9/04), 884 So. 2d 1176, 1179.

Despite the fact that defendant was not under arrest or officially detained,

defendant was nonetheless advised of his *Miranda* rights at the station. We find no error in the trial court's finding that defendant voluntarily waived his rights. At the suppression hearing, defendant claimed he had consumed half of a "fifth" of Jim Beam and smoked marijuana during the preceding hours. He also stated, however, that he did not have any trouble understanding the questions asked of him. Moreover, Deputy Hostnick and Detective Ward both testified separately that he did not appear intoxicated and appeared to understand everything they said. The trial court pointed to defendant's testimony at the suppression hearing, wherein he acknowledged that Detective Ward read his *Miranda* rights to him out loud, while he followed along with a written copy, and wherein he stated that the *Miranda* rights were familiar to him from his previous arrests, and that he understood what Detective Ward was doing and he agreed to sign the form and talk to her. Defendant further stated he understood he had a right to be represented by an attorney. The trial court was specifically impressed with defendant's ability to relate specific facts about his case and about his prior arrests, and based on his testimony and noting his prior work history, the court found defendant was "street smart" and had at least average adaptive skills. Furthermore, in considering the totality of the circumstances, it is relevant but not dispositive that a subject has been using intoxicants. *State v. Ludwig*, 423 So. 2d 1073, 1076 (La. 1983). Similarly, evidence of intellectual disability, without more, is insufficient to show involuntariness. *See Holmes*, 5 So. 3d at 72-73.

As to the specific circumstances in which physical evidence was collected from defendant, Detective Ward testified defendant never asked whether he had a choice in complying with the officers' requests. According to Lt. McDonnell, defendant voluntarily relinquished his boots and consented to the collection of his fingerprints, buccal swabs, and fingernail scrapings at 1:15 a.m. and 10:00 a.m., respectively. Although defendant maintains that he cooperated at the station only because he felt

compelled, he conceded that he never asked whether he was free to leave, never requested an attorney, never asked to place a call, and, up until his arrest, never invoked his right to remain silent. According to defendant, when Sgt. McDonnell asked to photograph his boots and collect his buccal swabs, fingerprints, and fingernail scrapings, he responded by asking whether he had a choice, to which he claims Sgt. McDonnell replied in the negative. In contrast, Lt. McDonnell testified that when he asked for the boots, defendant responded by stating, "you can have them, but it's the only shoes I got."[12] And when defendant was informed there were boots he could borrow, he "took his shoes off and held them out for [Sgt. McDonnell] to receive and put in a brown paper bag." When pressed as to whether defendant said anything further as he gave over his boots, or at any other point during the collection of evidence, Sgt. McDonnell testified defendant stated, in a "[v]ery relaxed" and "cooperative" demeanor, "you can have anything you want." Sgt. McDonnell denied defendant ever asked whether he had a choice to refuse to provide his boots or other physical samples. After defendant was returned to the Bruce trailer and then brought to the station a second time, he arrived carrying a duffle bag which, according to Detective Ward, he also voluntarily relinquished. In fact, by defendant's own admission, he read, understood, and voluntarily signed a written consent to the search of his bag. Defendant testified at the suppression hearing that the detective read the consent form to him, and further noted that the detective marked the form so that it specifically applied to the search of the bag.

In ruling on the motion to suppress, the trial judge found defendant voluntarily consented to the collection of his personal effects. The court therefore found all evidence obtained before his arrest admissible under the consent exception to the

---

[12] At trial, Lt. McDonnell explained that although he previously testified defendant stated "It's the only shoes I got," after reviewing his report he confirmed defendant actually used the word own.

warrant requirement. The court also found that any statements made before his arrest were admissible because they were made with full understanding of his rights, as evidenced by his testimony and the wavier he signed upon arrival at the station. Nothing in the record suggests the trial court unreasonably credited Sgt. McDonnell's testimony in concluding that defendant freely and voluntarily relinquished his boots, buccal swabs, fingernail scrapings, fingerprints, and duffle bag. The trial court properly examined the voluntariness of defendant's statements, in addition to assessing whether he consented to the searches and seizures, and acted within its discretion in concluding defendant's rights had not been violated. Defendant shows no error in the trial court's ruling.

## EVIDENTIARY RULINGS - EXCLUSION OF EVIDENCE
### (Assignments of Error # 2-5)

**Brandy Holmes' Statements**

Prior to trial, defendant filed a Motion to Admit Evidence, seeking to admit custodial and noncustodial statements by Brandy Holmes implicating third parties other than Robert Coleman as the perpetrator in the crime. In his memorandum in support of the Motion to Admit Evidence, defendant characterized the statements as follows:[13]

1)  A pre-arrest statement to acquaintances Chris Addison, Marvin Brown, and Johnny Wright, that she killed some old people;

2)  A custodial statement denying personal involvement and claiming Wright committed the murders;

3)  A custodial statement that she shot Mr. and Mrs. Brandon and stabbed Mr. Brandon while defendant and Wright were both present;

4)  A custodial statement that she shot both Brandons, that Wright cut Mr. Brandon, and that defendant did not participate;

5)  A custodial statement that she and Wright committed the crimes while defendant was at her mother's trailer;

---

[13] The actual statements were not proffered into evidence or otherwise detailed in the record.

20

6)      A custodial statement that Sean was not involved, that she and Wright planned the attack, and defendant "tagged along" but left saying he wanted nothing to do with it;

7)      A custodial statement that she did not murder anyone;

8)      A custodial statement that someone other than defendant was present with her during the crimes;

9)      A letter to her mother stating that Wright committed the crime while defendant was at the trailer;

10)     A letter to her friend Shay stating that Wright should take the charge;

11)     A letter to defendant in which she stated that defendant was innocent.

Defendant argues the trial court's blanket ruling preventing him from presenting any of Brandy's custodial or non-custodial statements resulted in the denial of his right to present a defense. Defendant argues he was entitled to employ the exculpatory statements even if those statements did not fit neatly within an exception to the hearsay rules. Citing *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed. 2d 297 (1973), defendant asserts that his Sixth Amendment right to present a defense trumps state evidentiary rules. Defendant argues the statements were sufficiently trustworthy to be placed before the jury for its consideration.

It was established that if called as a witness in this case, Brandy would assert her Fifth Amendment privilege and refuse to testify. Thus she was unavailable and her out of court statements were hearsay. Louisiana Code of Evidence article 804(B) provides certain exceptions to hearsay rules when the declarant is unavailable. Pertinent here is the exception set out in La. C.E. art. 804(B)(3):

B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability

21

and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Accordingly, in cases in which the proffered statement against interest was uttered by a co-defendant, against the co-defendant's interest, the party who seeks to admit the statement at his trial for its exculpatory value must first demonstrate its trustworthiness.

In *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed. 2d 476 (1994), the Supreme Court addressed the admissibility of a co-defendant's confession in the context of the hearsay exception provided by the parallel federal rule for declarations against interest, Fed. R. Evid. 804(b)(3). Williamson's co-defendant was called by the state but refused to testify, and the prosecution was then allowed to admit the co-defendant's entire confession, including statements in which he implicated Williamson. 512 U.S. at 597-98. In reversing the trial court's ruling admitting the statement in its entirety, the Supreme Court found that "the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Id.* at 600-01. The Court explained that "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statement unless they believe them to be true.... The fact that a person is making a broadly self-inculpatory confession does not make more credible the confessions' non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Id.* at 599-600. The Court stated the district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else. *Id.* at 600-01.

Similarly, in *State v. Lucky*, 96-1687 (La. 4/13/99), 755 So. 2d 845, this court discussed admissibility of an accomplice's statement. This court explained "the basis for the exclusion of an accomplice's statement even one which is against the accomplice's penal interest, is the longstanding perception that custodial confessions of non-testifying, unavailable codefendants are inherently suspect and presumptively unreliable as evidence against the defendant." 755 So. 2d at 857. Moreover, we noted "the hearsay exception for declarations against penal interest does not allow admission of non-self-inculpatory statements by accomplices, even if they are made within a broader narrative that is generally self-inculpatory." *Id*. Thus, we held that only the self-inculpatory parts of an accomplice's confession should be admitted.

Straightforward application of this rule to the instant case provides that only those portions of Brandy's statements in which she specifically inculpated herself would have been eligible for admission under La. C.E. art. 804(B)(3). Moreover, of those self-inculpatory portions, only those for which there existed corroborating circumstances clearly indicating trustworthiness would satisfy the requirements of La. C.E. art. 804(B)(3). In *State v. Hammons*, 597 So. 2d 990 (La. 1992), this court explained that the burden of satisfying the corroboration requirement is on the accused, and that the burden may be satisfied by evidence independent of the statement which tends, either directly or circumstantially, to establish a matter asserted by the statement. "Circumstantial evidence of the veracity of the declarant as to the portion of the statement exonerating the accused is generally sufficient. Typical corroborating circumstances include statements against the declarant's interest to an unusual or devastating degree, or the declarant's repeating of consistent statements, or the fact that the declarant was not likely motivated to falsify for the benefit of the accused." 597 So. 2d at 996-97.

In defendant's view, Brandy's statements "bore the persuasive assurances of

trustworthiness" and were deemed trustworthy even by the state, as indicated by its use of them at Brandy's trial. Defendant further claims that because some of Brandy's statements were corroborated by other evidence they were clearly trustworthy. The trial court disagreed and denied defendant's motion to admit the statements, having found defendant failed to establish their reliability. The court found Brandy's statements "extremely inconsistent" and noted defendant had failed to show that Brandy, who was at the time engaged in a romantic relationship with him, had not been lying to protect defendant when she implicated someone else.

We find no error in the trial court's exclusion of the statements. Not only did Brandy give several varying accounts, ranging from claiming she was innocent and not involved at all to admitting her direct personal involvement in Mr. Brandon's death, she also gave inconsistent information about her co-perpetrator's identity and in some instances directly inculpated defendant. That the state used some of Brandy's statements at her separate trial does not indicate they possessed independent worth as evidence of her co-perpetrator's identity, which is the purpose defendant asserts they would have served in his case. As the trial court found, Brandy conjured "a myriad of possibilities" as to how the crimes occurred, within which she obscured to varying degrees even her own role. Considering the inconsistent and inherently suspect nature of Brandy's statements, the court did not err in finding even those portions in which she directly implicated herself inadmissible under La. C.E. art. 804(B)(3).

We also find the exclusion of Brandy's statements did not violate defendant's right to present a defense. The Sixth Amendment of the United States Constitution and Article I, §16 of the Louisiana Constitution ensure a defendant the right to present a defense, and, as found in *Chambers v. Mississippi*, *supra*, few rights are more fundamental. In *Chambers*, the Supreme Court addressed the admission of hearsay evidence to protect a defendant's constitutional right to present a defense. Chambers

was convicted of murdering a police officer. At trial, he sought to introduce the hearsay testimony of three individuals to whom a third person, McDonald, had orally confessed to committing the murder on three separate occasions. The trial court excluded the hearsay statements. In reversing the conviction, the Supreme Court found the testimony "bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest." The Court noted:

> The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case - McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest.

410 U.S. at 300-01. Additionally, the Court found the testimony was also critical to defendant's defense. "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id*. at 302.

However, the Supreme Court has subsequently made clear that the fundamental right to present a defense does not require the trial court to admit irrelevant evidence or evidence with such little probative value that it is substantially outweighed by other legitimate considerations. In *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed. 2d 503 (2006), the Court stated that "while the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is

25

outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." 547 U.S. at 326.

In *State v. Gremillion*, 542 So. 2d 1074, 1078 (La. 1989), this court reversed defendant's manslaughter conviction, finding the lower courts' exclusion of certain statements violated defendant's right to present a defense. Defendant sought to introduce a statement the victim made to the investigating officer in which the victim was unable to identify his attacker, other to say he was attacked by three white men. Defendant and the victim had been close friends, having known each other for approximately eleven years. This court noted that although the statement did not fit into any of the recognized exceptions to the hearsay rule, it should have, nevertheless, been admitted into evidence due to its reliability and trustworthy nature. The court found the statement was corroborated by a similar statement the victim gave to the treating physician. Thus, while defendant and the victim were close friends, in two separate statements the victim failed to identify the defendant as his attacker. This court noted the statement was given to a police officer investigating the crime, and there was no circumstance to suggest the statement was untrustworthy.

The hearsay statements defendant sought to introduce in this case are not comparable to the type of evidence described in *Chambers* or *Gremillion*, and clearly lacked a sufficient degree of reliability. Defendant contends Brandy's statements were essential to the extent that they aligned with his theory he was never inside the Brandon home, the perpetrators were two white people, and the shoes he wore to the police station belonged to Brandy's brother. Specifically, he asserts statements in which Brandy claimed she and Wright (both of whom are Caucasian, unlike defendant) perpetrated the attack corroborate Mrs. Brandon's statement that she was attacked by two white people. Defendant also asserts Brandy's accounts were consistent with evidence at the scene, and defendant's own statement to police, in

26

which he claimed he was wearing Sean's boots, was corroborated by Brandy's similar statement to detectives.

We do not find these statements so critical that the trial court should have allowed them, and defendant has failed to show he was denied his fundamental right to present a defense in their absence. The jury was privy to ample evidence of Brandy's guilt. Additional evidence of her guilt, in the form of her own statements or otherwise, would have only been consistent with the state's theory of the case and of no value to the defense. Further, even without Brandy's statements inculpating Wright, the issue of Wright's alleged involvement was presented at defendant's trial. Given that the jury knew Wright was initially a suspect, Brandy's statements in which she inculpated Wright (along with defendant in some variations) would not have reasonably affected the jury's assessment of defendant's guilt. Moreover, Brandy's statement in which she allegedly told police defendant wore her brother's shoes into the station because his own were rain-soaked was not specified in defendant's "Motion to Admit Evidence" or his memorandum in support. Although defendant now references it specifically, he has failed to state with particularity what Brandy said or the circumstances in which she allegedly uttered it. Without more, it remains unclear that the probative value of such a statement, if it was in fact made, would have outweighed other legitimate considerations. La. C.E. art. 403.

Moreover, had any of Brandy's out-of-court statements been admitted, the state would have been permitted to present those statements in which she explicitly inculpated defendant to rebut his selective use of those in which she did not. *See* La. C.E. art. 806. Thus, it is unlikely the inclusion of the selected statements would have reasonably affected the jury's assessment of defendant's guilt. La. C.E. art. 103(A) provides that an error may only be predicated upon a ruling which excludes evidence if a substantial right of the party is affected. Here, the evidentiary rulings complained

27

of did not rise to the level of an impingement of the defendant's right to present a defense at trial. Finally, we note that even if these statements had been erroneously excluded, that ruling would be subject to the harmless error standard of review. *Holmes*, 5 So. 3d at 76; *see also State v. Van Winkle*, 94-0947 (La. 6/30/95), 658 So. 2d 198, 202. We find no error in the trial court's ruling.

**Measurement of Shoe Size**

Defendant argues he was also deprived of his right to put on a defense when the trial court prevented him from conducting a measurement of his shoe size using a Brannock device in front of the jury. Defendant argues this measurement was necessary to bolster his defense that the blood-spattered boots he wore to the police station belonged to Sean George. The state's forensic evidence established the shoes were a size 9. Defendant sought to demonstrate his shoe size falls between a 10.5 and 11.

The trial court sustained the state's objection on the ground that defendant did not have anyone with experience using the device to conduct the measurement. Specifically, the court stated:

> I do think we need somebody to measure him. I think the state has a good point there. I think he can be measured. But simply for him to step on there, I think you need someone to actually administer that device and measure him, somebody who has experience in doing that, because that isn't something that is just, for example, a tape measure that one would use in every[day] life. So I'm going to sustain the state's objection because that is a very specific device that is not used in everyday experience, and it can be manipulated. For example, he can pull his foot back, push it forward, so on and so forth, and the jury may or may not be able to see that. It's not the jury's - the jury shouldn't measure him, and he can't measure himself. So we need somebody who is qualified and has some experience using that device to measure him.…[W]e need somebody who is experienced with it to do the measurement and make sure his [heel] is all the way back, his toes are down where they're supposed to be, so on and so forth.
>
> … [T]he defendant could easily manipulate this measurement by simply causing his arch to, lifting his arch up, pulling his toes back, and that would not be easily identifiable by - or flattening his arch if he wants to

make his foot look larger he can simply push down on his arch and cause his foot to elongate. It's - there is (sic) too many ways that that could be manipulated without somebody here who has some experience and expertise, and frankly I don't even think just a shoe salesman, I think it would actually need to be somebody with some expertise in that device….Show that the objection of the state was sustained based on the fact that there is no one qualified to administer that measurement present.

Defendant asserts the court erroneously sustained the state's objection to his foot measurement and, contrary to the law and common experience, required that he be measured by someone with experience using a Brannock device.

Although Louisiana jurisprudence does not contain a bright line rule as to what sort of physical measurements require accompanying narration by an expert, defendant does not show the trial court abused its discretion in ruling defendant could not display his foot measurement without the aid of someone with experience using the measuring device. Although display of a physical feature is generally considered demonstrative rather than testimonial, the mode and order of all evidentiary presentations are subject to court control. La. C.E. art. 611 provides that, although "the parties to a proceeding have the primary responsibility of presenting the evidence," their actions are subject to exercise of reasonable control by the court to ensure ascertainment of the truth, avoidance of needless consumption of time, and protection of witnesses from harassment or undue embarrassment. Defendant had no plan to call anyone, even a lay witness, to conduct his measurement. Rather, the record reflects defendant planned only to display his feet while standing on the device so jurors could observe his feet were larger than the shoes he wore into the police station. Significantly, the trial court did not rule that defendant was barred from demonstrating his shoe size, but rather made a reasoned determination as to the appropriate means of doing so. Given that a Brannock device cannot speak for itself, and, as the court noted, defendant might not have accurately measured his own feet, we find the judge did not abuse his discretion by ruling defendant needed someone with experience

using a Brannock device to ensure the demonstration would be useful to the jury.

**Brandy Holmes' Juvenile Adjudications**

Defendant argues the trial court erroneously denied his request to introduce Brandy Holmes' juvenile records. Defendant sought to introduce the records in his case in chief to rebut the state's claims that defendant was "training" or testing Brandy and that they were inseparable partners in crime. Defendant intended to introduce the records to show that Brandy had a long-standing history of criminal behavior, including other home invasions, predating her association with defendant. La. C.E. art. 609.1(F) provides that juvenile delinquency adjudications are generally inadmissible for the purpose of attacking witness credibility. When the juvenile records of a witness are at issue, courts are called upon to determine whether the impeachment value of the juvenile adjudications is outweighed by the state's interest in maintaining the confidentiality of juvenile records. Cases allowing introduction of such records have presented the issue in terms of the defendant's constitutional right to confront the witness. Here, however, Brandy was not a testifying witness, so these cases are not directly applicable. *See, e.g., State v. Chester*, 97-2790 (La. 12/1/98), 724 So. 2d 1276; *State v. Smith*, 437 So. 2d 802 (La. 1983); *State v. Toledano*, 391 So. 2d 817 (La. 1980).

As recognized earlier in this opinion, a defendant has a fundamental right to present a defense. The trial court is nevertheless vested with broad discretion to determine whether evidence is relevant or, even if relevant, has such little probative value that it is substantially outweighed by other considerations. La. C.E. art. 403. In sustaining the state's objection to Brandy's juvenile records, the trial court determined the risk of confusion, misleading the jury, and wasting time, outweighed any probative value the records might possess. The court credited the state's assertions that the

30

records were too old and factually unrelated to be relevant in this case and, opined further that the records actually bolstered the state's theory because they demonstrated Brandy's juvenile history was non-violent. The court also noted the records lacked any exculpatory value for defendant. Given that the records defendant sought to present were for non-violent offenses Brandy committed roughly a decade before the Brandon murder, the trial court did not erroneously determine they were irrelevant and unfit for the proffered purpose. The fact that as a juvenile Brandy was adjudicated delinquent for non-violent crimes has no bearing on defendant's guilt in this case. No reversible error is shown.

**Photographs seized from Brandy Holmes' Room**

Defendant also asserts the trial court erred in refusing to allow him to introduce 18 photographs that were seized during a search of Brandy's bedroom in her mother's trailer. Defendant states these photos depict a number of other African-American men with whom Brandy was friends, and in some of the photos the males were making lewd gestures or gang signs. Defendant sought admission of these photos to show the jury that the "fuzzy" African-American man depicted in the Hibernia ATM surveillance video photos could have just as easily been one of her other male friends.

In sustaining the state's objection to the introduction of the photos, the trial court determined the risk of confusion, misleading the jury, and wasting time, outweighed any probative value the photos might have possessed. Specifically, the court found:

> The jury has a photograph of two individuals standing at an ATM, they have photographs of the arrest of Mr. Coleman, and Mr. Coleman is seated in court, and they can look at those photographs and determine if that appears to be him or not. To simply flood the jury with a bunch of pictures of African-American males, I don't see any probative value quite frankly. I mean, if that were the case every time we had a photograph of a suspect we could simply flood the jury with a box full of pictures and make the argument, well, it could have been any one of these people whether they were white, black, Hispanic, or purple, green,

whatever they are. I just don't see the probative value.

Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible. *See, e.g.*, *State v. Magee*, 11-0574 (La. 9/28/12), 103 So. 3d 285, 323; *State v. Lanieux*, 09-675 (La. App. 5 Cir. 3/9/10), 39 So. 3d 606, 609*; State v. Lindsey*, 404 So. 2d 466, 475 (La. 1981). A trial court's ruling with respect to the admissibility of photographs will not be overturned unless it is clear the prejudicial effect of the evidence outweighs its probative value. *Magee*, 103 So. 3d at 323; *Lindsey*, 404 So. 2d at 475. Additionally, although the accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged, such evidence may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial. *Holmes*, 547 U.S. at 327.

We find the trial court did not abuse its discretion when it excluded the photos. Contrary to defendant's assertions, evidence that Brandy, or someone else who used her bedroom, associated with African-American men other than defendant does not indicate that any of those individuals had any connection to the Brandon murder. The photos by no means constituted non-speculative proof of any third-party's guilt in this case and were wholly irrelevant.

**Cumulative Prejudice**

Defendant claims that the cumulative prejudice arising from the trial court's evidentiary rulings constitutes reversible error. Defendant argues the trial court's rulings on these issues, prohibiting him from presenting evidence in support of his defense of innocence, violated his right to confront the evidence against him and to present a complete defense. Because we find no error in these individual rulings, we

32

also find no prejudice simply from considering the issues cumulatively. Further, although cast as a grievance about the cumulative prejudice he alleges he has suffered, his complaint is akin to the oft-rejected "cumulative error" claim. This court has reviewed cumulative error arguments and universally found that harmless errors, however numerous, do not aggregate to reach the level of reversible error. *See, e.g.*, *State v. Strickland*, 93-0001 (La. 11/1/96), 683 So. 2d 218, 239; *State v. Tart*, 94-0025 (La. 2/9/96), 672 So. 2d 116, 164; *State v. Copeland*, 530 So. 2d 526, 544-45 (La. 1988); *State v. Sheppard*, 350 So. 2d 615, 651 (La. 1977). Defendant offers no compelling reason why the court should alter its position.

## JAILHOUSE INFORMANT TESTIMONY
### (Assignments of Error # 6 & 7)

Defendant argues the state was erroneously allowed to introduce the testimony of two jailhouse informants, Bobby Evans and Collies Sharpes, who were temporarily in the same holding cell with defendant immediately following his arrest. Defendant asserts their statements were unreliable on their face and their testimony did not meet the heightened standards for reliability in a capital case. Defendant points out the statements were internally inconsistent and inconsistent with evidence at the crime scene: Evans has given differing statements as to whether defendant shot either victim; some of Sharpes' statements differed materially from Evans' statements; Sharpes' account evolved; and portions of Evans' statements were inconsistent with the evidence at the crime scene. Additionally, defendant argues their testimony was unreliable because, at the time of their cooperation, both witnesses were facing criminal charges and both expressed a desire and hope for leniency in exchange for information against defendant. Defendant asserts regardless of whether Evans and Sharpes actually received favorable treatment in exchange for providing information, their hope or expectation of leniency at the time they approached the police is

sufficient to establish a significant bias undermining the reliability of this evidence.

After review of the record, we do not find the trial court abused its discretion in admitting the testimony. Defendant was given ample opportunity to attack the witnesses' credibility at trial, and was able to address the inconsistencies in their testimony. The inconsistencies were also highlighted by defense counsel in closing argument:

> You heard the testimony of Collies Sharpes and Bobby Evans. And I told you in opening, those two witnesses statements would be [inconsistent] with each other, they weren't the same as each other, [they] weren't the same as facts we know to be proven. They were, they had information that they could not have otherwise had, that is one thing I'll agree with Mr. Cox on, and I'll explain that in a moment. Mr. Sharpes told you that Robert said that Brandy killed both of them. I asked him that question, are you sure about it, yes. Mr. Evans reluctantly here, tells Detective McClure sometime after the intake that Robert said that he killed the woman and Brandy killed the man.
>
> That didn't work, so when he testified at the grand jury he flipped it, and Robert killed the man and Brandy killed the woman. He also admitted saying that Reverend Brandon, Robert had told him Reverend Brandon had hit Brandy in the face with a Budweiser bottle. Well, that was false. He also said Robert told him they tied them up, and that was false. He also told him that Robert had buried a gun in the backyard, and that was false. So the statements are not consistent with each other, they're not consistent with known facts.

We find the jury had a full opportunity to consider the inconsistencies in the statements and was able to consider what weight, if any, to give their testimony.

Moreover, although the possibility of state leverage over a witness arising from pending criminal charges is highly relevant to establish bias or interest, any potential bias arising from pending charges goes to the jury's credibility determination, not the admissibility of the testimony. *See State v. Vale*, 95-1230 (La 1/26/96), 666 So. 2d 1070, 1072; *State v. Rankin*, 465 So. 2d 679, 681 (La. 1985); *State v. Brady*, 381 So. 2d 819, 821-22 (La. 1980). The jury was made aware that Sharpes and Evans faced unrelated charges when defendant made the disclosures to them. Defense counsel emphasized that circumstance in his closing argument and theorized for the jury that

the witnesses actually obtained the details they claimed defendant divulged by other means:

> We know that Bobby Evans, in April, shortly after giving those statements was facing [five] to 20 years, and received a sentence of three years concurrent with his two-year sentence on yet another felony, okay. But the most convincing evidence that you will have that you know Collies Sharpes and Bobby Evans were telling you a story was the statement about Brandy flushing the jewelry. When I asked each and every detective, officer, anyone that was at the police station that night, I said, did you let them, did you let Sean and Brandy talk, get their stories together? No, we keep them separate, that's proper procedure, there is no way we would let them be together, they're kept separate. I said, well, what about Robert and Brandy, none, separated. What about Brenda Bruce and Sean George and Robert, no, they're separated.
>
> Now, here is the point. They kept them separated, which is exactly what they do, they don't want people talking to each other, there is no way Robert knew Brandy flushed that jewelry. Because they were separated, they weren't allowed to talk, they weren't allowed to get their stories straight, there was no way that Robert knew Brandy flushed that jewelry. So he's taken directly to Caddo Correction, he's put in with Collies Sharpes, Bobby Evans, then all of a sudden detectives come and speak, and Collies Sharpes and Bobby Evans somehow have information that Robert Coleman himself could not possibly have possessed. To me that is the most convincing evidence that Collies Sharpes and Bobby Evans are telling you a story.

The jury also heard testimony from the attorney who represented them relative to those criminal charges that neither Sharpes nor Evans received any leniency in return for their cooperation in defendant's case. For these reasons, we find no error in the admission of this testimony.

Defendant additionally argues he was denied due process because the state failed to disclose inconsistencies in Sharpes and Evans testimony, as well as evidence indicating that Evans was coerced into testifying. Specifically, defendant complains the state waited until five days before trial to disclose that Evans' grand jury testimony was inconsistent with his initial statement as to whether it was defendant or Brandy who shot each victim, and it was clear from Evans' trial testimony that the state forced him to take the stand against his will.

The suppression of evidence favorable to the accused violates due process where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 88, 83 S.Ct. 1194, 1197, 10 L.Ed. 2d 215 (1963). Favorable evidence includes both exculpatory evidence and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed. 2d 481 (1985); *State v. Knapper*, 579 So. 2d 956, 959 (La. 1991). Moreover, late disclosure of favorable evidence may require reversal if the timing significantly impacted the defendant's opportunity to effectively present the material. *State v. Kemp*, 00-2228, (La. 10/15/02), 828 So. 2d 540, 545-46. Still, *Brady* and the decisions that follow do not establish a general rule of discoverability and the state's failure to disclose or late disclosure does not automatically mandate a reversal. Rather, the defendant must first show he suffered prejudice as a result. La. C.Cr. P. art. 921; *see also United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct 2392, 2400, 49 L.Ed. 2d 342 (1976); *State v. Willie,* 410 So. 2d 1019, 1030 (La. 1982).

Here, defendant complains the state's late and limited disclosures prevented him from effectively presenting evidence which would have undermined Evans' credibility. Specifically, defendant complains the state waited too long to disclose that Evans' testimony before the grand jury was inconsistent and that he was forced to testify at the second trial. As set out above, however, the jury was well aware that Evans gave a differing account as to defendant's claims concerning who shot each victim and knew that Evans was less than enthusiastic about testifying at the re-trial. In fact, defense counsel exploited the inconsistencies among Evans' prior statements for the jury. Moreover, Evans clarified why he was reluctant to testify at the re-trial: he had time left to serve and was fearful he might cross paths with defendant again behind bars. Defendant fails to show he was prejudiced by the late disclosure or that the state suppressed anything capable of undermining the verdict. As a result of

Evans' testimony, the jury was aware the state took measures to ensure his testimony at the second trial, and defendant possessed an adequate opportunity to cross-examine Evans as to the veracity of his testimony. Thus, we find no error in trial court's ruling.

## ADMISSION OF OTHER CRIMES EVIDENCE - GUILT PHASE
### (Assignment of Error # 13)

After a pretrial *Prieur*[14] hearing, the trial court ruled the state would be allowed to introduce testimony from Terrance Barnes. Barnes testified that on the night prior to the Brandon murder, he met defendant at Brandy's New Year's Eve party and he observed defendant holding a revolver and later in the evening defendant asked Barnes if he knew where he could "hit a lick," meaning commit a robbery. Defendant argues this evidence was not relevant for a legitimate purpose, and any probative value was outweighed by its prejudicial effect. Defendant argues the testimony should have been excluded because the gun observed by Barnes was not linked in any way to the Brandon murder, as proven by ballistics evidence. Further, defendant argues Barnes' testimony that he understood the phrase "hit a lick" to mean defendant wanted to know where he could commit a robbery should not have been admitted because defendant submitted evidence that the phrase has many common meanings, and has different meanings in different states. Thus, Barnes' belief as to the meaning of the phrase was purely speculative. Defendant further argues because the gun shed no light on the crime, it only served to prejudice the jury against him for a completely unrelated bad act and should have been excluded under La. C.E. art. 403.

La. C.E. art. 404(B)(1) generally prohibits courts from admitting evidence of other crimes or bad acts to prove a defendant's bad character. However, such evidence is admissible if the state establishes an independent relevant reason, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake

---

[14] *State v. Prieur*, 277 So. 2d 126, 130 (La. 1973).

or accident. La. C.E. art. 404(B)(1). At the *Prieur* hearing, investigator Don Ashley, who had thirty-seven years of law enforcement experience, testified regarding Barnes' encounter with defendant. Mr. Ashley testified he understood the phrase "hit a lick" to mean that defendant wanted to commit a robbery. Mr. Ashley inquired about the meaning of the phrase in defendant's native Tylertown, Mississippi, and learned that the meaning there was the same: "The vernacular in the street is that the first thing when somebody is talking about doing a lick it's some type of robbery....[T]he common impression when you say a lick is that you're going to do a robbery." After the hearing, the trial court found:

> The testimony is that a witness stated that on the day before the murder . . . the defendant was asking him where he could hit a lick, and that he also observed him with a small firearm, a handgun. The following day the victims or Mr. Brandon was murdered, and the prosecution wishes to introduce evidence of the conversation taking place the day before. The Court has had many occasions, many cases where the term hit a lick was used. In the Court's experience it has always been relating to committing a robbery. The Court finds that this certainly fits within the intent of Article 404(B). It does tend to show evidence such as proof of motive, opportunity, intent, preparation, plan, knowledge, and absence of mistake or accident. Certainly all fit within the parameters of 404(B). For those reasons the Court will allow the evidence to be introduced.

The trial court has broad discretion in weighing the probative versus prejudicial value of evidence under La. C.E. art. 403, and its ruling on the admissibility of evidence pursuant to La. C.E. art. 404B(1) will not be disturbed absent an abuse of discretion. *See State v. Bordenave*, 95-2328 (La. 4/26/96), 678 So. 2d 19, 21; *State v. Carter*, 15-99 (La. App. 5 Cir. 7/29/15), 171 So. 3d 1265, 1280; *State v. Waterhouse*, 14-1048 (La. App. 4 Cir. 6/19/15), 171 So. 3d 1113, 1115. Evidence that defendant possessed a gun, whether it was actually the murder weapon or not, and evidence that defendant asked Barnes where he could "hit a lick," a phrase understood to be an expression of desire to commit a robbery or theft, was independently relevant to and probative of defendant's motive, opportunity, intent, and preparation in connection

with his invasion of the Brandon home the very next day. Thus, we find no abuse in the trial court's discretion in admitting the evidence.

## LIMITATION OF VOIR DIRE
### (Assignment of Error # 15)

Defendant argues he was denied his right to a full and fair voir dire when the trial court improperly limited the scope of voir dire by disallowing defense counsel to inquire into a prospective juror's attitudes about penalty phase aggravators, specifically a defendant's involvement in a second homicide. Defendant argues he must be able to determine a prospective juror's opinion on the specific aggravating factors in this case without discussing specific facts in order to determine if a juror is eligible to serve.

As a general matter, an accused in a criminal case is constitutionally entitled to a full and complete voir dire examination. La. Const. art. I, § 17. However, the scope of counsel's examination rests within the sound discretion of the trial judge and voir dire rulings will not be disturbed on appeal absent a clear abuse of that discretion. La. C.Cr. P. art. 786; *State v. Tilley*, 99-0569 (La. 7/6/00), 767 So. 2d 6, 19. Further, the right to a full voir dire does not afford the defendant unlimited inquiry into possible prejudices of prospective jurors, including their opinions on evidence, or its weight, hypothetical questions, or questions of law that call for any prejudgment of supposed facts in the case. *State v. Ball*, 00-2277 (La. 1/25/02), 824 So. 2d 1089, 1110. A party interviewing a prospective juror may not ask a question or pose a hypothetical which would demand a commitment or prejudgment from the juror or which would pry into the juror's opinions about issues to be resolved in the case. *Ball*, 824 So. 2d at 1110; *Tilley*, 767 So. 2d at 19. "It is not proper for counsel to interrogate prospective jurors concerning their reaction to evidence which might be received at trial." *Ball*, 824 So. 2d at 1110.

In the present case, defense counsel questioned prospective jurors, in particular Mr. Robert Horne, about whether he believed the only appropriate penalty would be a death sentence in a case in which the jury unanimously found the defendant guilty of first degree murder under the sort of circumstances present in this case:

> [Q:] …I would like to start with Mr. Horne. Assuming that you have a situation where you and 11 other jurors have found beyond a reasonable doubt that the defendant has committed an intentional murder, again it's not committed in the heat of passion, the person was not legally insane, it was not self-defense or defense of others, he wasn't so intoxicated that he couldn't formulate a specific intent and in addition to that there were one of the other factors such as the victim was over the age of 65 or under the age of 12 or it was committed in the course of an armed robbery or an aggravated burglary, for you, Mr. Horne, for you at that point is death the only appropriate penalty?

The state objected that the question was "limiting the jurors to a specific and arbitrary point," and precluding the prospective juror from considering any mitigating circumstances, which he would have been required to consider. The defense responded that it was a "very clean *Morgan v. Illinois* question" which simply put the juror in a position where he has found someone guilty of first degree murder and queried whether he would still be open to imposing a life sentence.[15] The court overruled the state's objection and permitted defense counsel to proceed. Subsequently, prospective juror Horne made clear that he would have to hear the whole case and everything from each side before determining whether to give a sentence of life or death.

As defense counsel pursued substantially the same line of inquiry with prospective juror Mr. Claude Clary, Jr., the state objected when counsel divulged further that she anticipated the state would attempt to show that defendant acted as a principal in another homicide:

---

[15] In *Morgan v. Illinois*, 504 U.S. 719, 726, 112 S.Ct. 2222, 119 L.Ed. 2d 492 (1992), the Supreme Court held that venire members who would automatically vote for the death penalty must be excluded for cause, reasoning that any prospective juror automatically voting for death would fail to consider the evidence of the aggravating and mitigating circumstances, thus violating the impartiality requirement of the Due Process Clause.

Defense counsel:   Can you give me some examples of things that you would want to hear in deciding between life and death?

Mr. Clary:   Does this person have a history of criminal, has he killed before, was he a drug dealer, whatever.

Defense counsel:   And let's assume that you found out that the person did have a history of criminal behavior. Is that a fact that would prevent you from considering both life and death at that point?

Mr. Clary:   It still wouldn't have prevented it, but I mean it would have to be what's the nature of it.

Defense counsel:   I mean I'm not going to try to hide the ball on you. The state has alleged, and we certainly do not agree, but the state has alleged, and you will hear evidence if you were to get to a penalty phase in trial - the state has alleged that Mr. Coleman was a principal in another murder. Given those facts would you still be open -

Prosecutor:   You Honor, I would like to lodge an objection, please.

The court:   Okay, Mr. Bailiff. Ladies and gentlemen, we are going to have you retire to the jury room. . . .

Prosecutor:   Your Honor, [defense counsel] made the reference that the state has alleged that Mr. Coleman has participated in another murder which is entirely fact specific and an impermissible reference to the murder of Terrance Blaze and what I believe the idea is to taint the entire panel by getting extremely inflammatory talking about another murder. Her example touches on what the state's allegations are and is going to be putting facts at play trying to disqualify two white males. I would point out that the defense both times when they [began] the questioning have started with trying to target white males. I just want to make the part of the record because that's obviously where they have been. We saw how she badgered the first man, and this time my specific objection is she is getting into a very fact-specific inquiry about Terrance Blaze which should not be part of the voir dire process.

The court:   Response?

Defense counsel:   Your Honor, the case law is very clear, both federal and state, that in order to serve as a juror in a first-degree murder case that a person has to be open to both life and death in this case. I think *State v. Allen Robertson* talks about that, *State v. Maxie, State v. Divers.…*

The court:   Well, you know, I reviewed that case last night after you had brought it up last night. Can you show me where *State v. Divers* says that?

Defense counsel:   I may be - I know that *Divers* was along the same

lines as *Robertson*. If I'm wrong about that, I apologize, but I know certainly *Robertson* says it very specifically, and I can show you the language specifically from *Robertson*.... It says that a prospective juror can conceive of certain situations where he might vote for life imprisonment rather than death is inconsequential where that same juror has clearly stated he could only vote for the death penalty in the case before him. The fact scenario in *Robertson* was that it was a killing of more than one person and there were jurors who said that they could consider - I apologize, but I don't want to be mixing up cases. A juror said, "Well, you know if it's a double murder, then I could only vote for the death penalty," and that juror was allowed to or the defense cause challenge was denied. The defense had to use a peremptory, I believe. . . . [And the Louisiana Supreme Court] found that that use of the peremptory was reversible error because the challenge, the defendant's challenge for cause should have been granted because even though there were cases where the juror could consider life he could not consider life in the case before him.... In this case the state has made certain allegations such as a victim over 65 in the perpetration of an aggravated burglary or an armed robbery, and one of the other allegations that the state has made is that Mr. Coleman has committed a separate murder... and so if a juror could consider life in other circumstances but not in this case he is not qualified to serve.

The court:    So your argument is you should be allowed to ask questions concerning specific facts in this case?

Defense counsel:    That's correct, your Honor. I think that's Louisiana Supreme Court law....

The court:    ...[Y]ou are questioning these prospective jurors concerning specific facts in this case. Do you have a case that gives you the authority to do that?

After recessing to consider the parties' positions, the trial court sustained the state's objection, finding some measure of fact-sensitive questioning permissible as long as the questions did not pertain directly to specific evidence to be adduced during the proceedings:

Before this trial began I instructed all counsel to read and be familiar with *State v. Ball*, 824 So. 2d 1098, Louisiana Supreme Court 2002 opinion and also *State v. Hall*, 616 So. 2d 664, Louisiana Supreme Court 1993. If all counsel have not read that opinion for this particular trial, I will instruct you to do so once again.

***

Now, I will agree with [the defense] that you may ask questions concerning, for example, could you consider imposing a life sentence if the facts show that the homicide was committed during a burglary?

42

That's a permissible question. Could you consider imposing a life sentence if the facts showed that the defendant attempted to kill more than one [person]? That's a permissible question. But you went beyond that when you went on to say that the state is going to introduce at the penalty phase evidence to show that a second murder was committed. That's far beyond the scope of saying, "Could you consider a life [sentence] under the field facts in this case?" You may do that, but to go beyond that and say that the state is going to introduce evidence concerning a second homicide that might have occurred is going far afield particularly…when Mr. Horne made it completely clear throughout his entire voir dire that he is going to accept either - that he could impose either a death penalty or a life [sentence]. He rated himself as a [three] which is dead in the middle. He said he would have to hear all the facts before he decides the penalty…He is open to both penalties, can go either way.

[T]he defense and the state will be able to ask questions concerning the general allegations in this case. For example, could you consider a life [sentence] or a death penalty for someone convicted of murder involving a burglary? Could you consider imposing a life [sentence] or a death penalty for someone convicted of a murder involving more than one? Those are permissible questions. To go beyond that, particularly when jurors, potential jurors, have consistently shown that they are open to any and all sentences and to go beyond that any ask questions or pose questions of a prospective juror on specific facts is clearly impermissible under Louisiana law and federal law.

Later in voir dire, the court elaborated on its ruling by explaining that, once a prospective juror's neutrality as to application of the death penalty has been established, the defense is not permitted to attempt to elicit his opinion or expected reaction as to specific facts of this case:

My ruling on the specific objection is when you went beyond and went into the penalty phase concerning other evidence that may or may not come out, and trying to get a juror who has clearly demonstrated a very neutral position to precommit on their position . . . in violation of *State v. Ball*. Alright. So I don't know how I can make it any clearer.

We find no error in the trial court's ruling. This court has never found the right to a full voir dire entitles the defense to carry out a fishing expedition, using specific evidence it anticipates will be adduced at trial to detect latent biases it suspects individual venire members may be harboring. To the contrary, the jurisprudence clearly provides that counsel may not divulge specific facts of the case and then ask

jurors to commit themselves to a verdict based thereon. *Ball*, 824 So. 2d at 1110. As the trial court found in this case, the defense was not precluded from eliciting venire members' views as to whether and when the death penalty is appropriate. The court's ruling in this case correctly allowed for voir dire questions aimed at revealing honest opinions as to what sort of circumstances, whether aggravating or mitigating, would sway individuals in one direction or the other. The trial court's determinations were also in line with well-established jurisprudence which provides that a prospective juror who, having been equipped by whatever avenue with enough information about the particular case, indicates that he will be unable to return a sentence of death, is unqualified to sit as a capital juror, although he may have expressed an abstract or theoretical ability to consider both death and life. *See State v. Williams*, 708 So. 2d 703 (La. 1998); *State v. Comeaux*, 514 So. 2d 84 (La. 1987).

## SPECIFIC JUROR ISSUES
### (Assignments of Error #14, 16 - 22)

### Janet Davis (Assignment of Error #14)

On the first day of the guilt phase of the trial, before the selected jurors were sworn in and prior to opening statements, juror Janet Davis advised the courtroom bailiff that someone had told her something about the case. Ms. Davis was brought in the courtroom for individual questioning by the court:

> The court:    Ms. Davis, the bailiff indicated to me that you told him that somebody had said something concerning the case to you, and you wanted to bring that to the Court's attention.
>
> Ms. Davis:   Yes. I just wanted you to know that someone inadvertently told me this morning that this was a retrial.
>
> The court:    Okay.
>
> Ms. Davis:   And I had that information, so I wanted you to know that.
>
> The court:    All right. How did the information come to you?
>
> Ms. Davis:   On the, well, they just came downstairs and told me.

The court:     And is that, was there any discussion that took place about that?

Ms. Davis:     No, no, because I stopped and I said, you are not supposed to tell me anything. I said, I'm not supposed to know one thing.

The court:     Okay. And did that influence you in any form or fashion?

Ms. Davis:     No, it did not.

The court:     Can you set aside any information that you might have heard about this case and base your opinion solely on the evidence that you hear in the courtroom?

Ms. Davis:     Yes, sir.

The court:     Do you understand that the defendant is presumed innocent, and that is a serious presumption, and that the State carries the burden of proving beyond a reasonable doubt the charges that they allege? Do you understand that?

Ms. Davis:     Yes, sir.

The court:     And can you apply that presumption?

Ms. Davis:     Yes, sir.

The court:     Regardless of anything that you might have heard?

Ms. Davis:     Yes, sir.

The court:     What was the fullest extent of what you heard?

Ms. Davis:     Verbatim?

The court:     Yes.

Ms. Davis:     He came downstairs, and he said the case is State versus Robert Coleman, and he said, and this is a retrial. And that's when, I mean, the whole thing shocked me because it was 6:00 in the morning making coffee, and as soon as that was said I said, don't say anything. I said, you're not supposed to say anything to me. So that was the entire conversation.

The court:     Okay. All right….

The court gave the state and defense the opportunity to question Ms. Davis, but both sides declined. The defense then challenged Ms. Davis for cause, asserting defendant had "an absolute right to have jurors that are not aware that it is a retrial or draw any

45

inferences from that." The defense further expressed concern that Ms. Davis could unintentionally share this information with the other jurors. The court then returned Ms. Davis to the courtroom and further advised her:

> The court: …Ms. Davis let me emphasize to you, it is extremely important that you not discuss at all with any of the other jurors what you have informed the court of.
>
> Ms. Davis: I haven't.
>
> The court: Have you said anything to them at all?
>
> Ms. Davis: Not a word, not a word.
>
> The court: Well, keep it that way, okay. Do not discuss anything that you've heard. And once again, can you put aside anything that you were told by anyone or anything that you've heard, can you set that aside and be fair and impartial in this case?
>
> Ms. Davis: Yes, I can.
>
> The court: Can you base the totality of your opinion, can you base your opinion on the evidence that you are going to hear in this case?
>
> Ms. Davis: Yes, sir.
>
> The court: Can you apply the presumption at this time that the defendant is presumed innocent and hold the state to [its] burden of proof beyond a reasonable doubt?
>
> Ms. Davis: Yes, sir.
>
> The court: All right. Thank you very much. Do not discuss anything that you've told us with any of the other jurors at any time. Thank you, ma'am.

The trial court denied the challenge for cause, noting it was convinced Ms Davis could remain fair and impartial. The court stated Ms. Davis had been very forthcoming throughout the totality of the voir dire and appeared sincere in her impartiality. The court then returned the entire jury to the courtroom to ensure no one else had learned information about the case:

> The court: I want to ask each of you if since the last time we talked to you if any of you have heard anything about this case from any source at all…. If any of you have heard anything about the case since we talked

46

to you last please raise your hand. All right. And no one is raising their hand.

The jury was sworn in and trial commenced. The trial court further supplemented its ruling on Ms. Davis, finding her credibility exceptional because she immediately disclosed the information to the bailiff and requested that it be disclosed to the court. Further, the court observed Ms. Davis to be truthful and forthcoming throughout the entirety of her vior dire.

La. C.Cr. P. art. 797 sets forth the grounds for which a juror may be challenged for cause. Two of these grounds are pertinent here, namely, that "[t]he juror is not impartial, whatever the cause of his partiality" and "[t]he juror will not accept the law as given to him by the court." La. C.Cr. P. art. 797(2) and (4). "[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." *State v. Hallal*, 557 So. 2d 1388, 1389-90 (La. 1990). Reversible error is demonstrated and prejudice is presumed in cases in which a defense challenge for cause was erroneously denied and the defendant ultimately exhausted his peremptory challenges. *State v. Jones*, 03-3542 (La. 10/19/04), 884 So. 2d 582, 588; *State v. Ross*, 623 So. 2d 643, 644 (La. 1993). Here, defendant exhausted his peremptory challenges; thus, he need only show that the trial court abused its discretion when it denied any one of his challenges for cause.

In ruling on a challenge for cause, the trial court is vested with broad discretion and its ruling will be reversed only when the voir dire record as a whole reveals an abuse of discretion. *State v. Odenbaugh*, 10-0268 (La. 12/6/11), 82 So. 3d 215, 237; *State v. Robertson*, 630 So. 2d 1278, 1281 (La. 1994). After individually interviewing Ms. Davis twice, the trial judge denied defendant's challenge for cause because he

was thoroughly convinced she could remain fair and impartial and set aside her knowledge that the proceeding was a retrial. The court noted further Ms. Davis had been very forthcoming and appeared sincere in her impartiality. Given that Ms. Davis stated her ability to remain impartial and to accept and apply the law given by the court, the record does not support defendant's claim that she should have been excused. There is nothing in the record which indicates Ms. Davis had knowledge of the outcome of the prior trial or the reason for a retrial. Nothing about the fact that this trial was a retrial is inherently prejudicial without further knowledge. The fact that Ms. Davis became aware that this was a retrial was, in and of itself, neutral information. Nothing in the record indicates Ms. Davis was incapable of serving impartially in this case or that there existed any legitimate basis for her exclusion. Thus, we find no reversible error in the trial court's denial of defendant's challenge for cause.

**Denial of Cause Challenges**

Defendant argues six challenges for cause were improperly denied by the trial court. Defendant asserts three jurors - Glenda May, Anita Rainer, and Lena Kelly - testified they would automatically impose the death penalty for first degree murder. Defendant also asserts three jurors - Cynthia Bates, Anita Rainer, and Jennifer McMullen - indicated they could not accept mental retardation and/or mitigating circumstances.

A prospective juror may be challenged for cause if he is not impartial, "whatever the cause of his partiality," or if he will not accept the law as given by the court. La. C.Cr. P. art. 797(2) and (4). As this court explained in *State v. Ball*:

> [A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his

duties as a juror in accordance with his instructions and his oath." *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1968). In a "reverse-*Witherspoon* " context, the basis of the exclusion is that a prospective juror will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him ... Jurors who cannot consider both a life sentence and a death sentence are "not impartial," and cannot "accept the law as given ... by the court." In other words, if a prospective juror's views on the death penalty are such that they would "prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths," whether those views are for or against the death penalty, he or she should be excused for cause. The failure to disqualify a venireman unable to consider both life and death as penalties constitutes reversible error.

824 So. 2d at 1102-03. (Internal citations removed). Yet the trial court's refusal to disqualify a prospective juror does not constitute reversible error or an abuse of discretion if, after further examination or rehabilitation, the juror demonstrates willingness and ability to decide the case fairly according to the law and evidence. *State v. Howard*, 98-0064 (La. 4/23/99), 751 So. 2d 783, 795; *Robertson*, 630 So. 2d at 1281. Thus, a prospective juror who simply indicates a personal preference for the death penalty need not be stricken for cause. *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, 936; *Lucky*, 755 So. 2d at 850.

Additionally, a juror must consider any mitigating circumstances (statutory or otherwise) before determining whether or not the death sentence should be imposed. La. C.Cr. P. art. 905.3. While a juror has the discretion to assign whatever weight the juror deems appropriate to any mitigating circumstance established by the evidence, the juror must be willing to consider mitigating evidence relevant to the character and propensities of the defendant and must be willing to fairly consider a life sentence. *State v. Miller*, 99-0192 (La. 9/6/00), 776 So. 2d 396, 402-03.

**Glenda May (Assignment of Error #17)**

Defendant asserts the trial court erroneously denied his challenge for cause as to Glenda May. Defendant argues Ms. May's responses to voir dire questioning reveal

an inability to give meaningful consideration to a life sentence. Ms. May's statement that she would want to hear everything before making a decision was clearly a result of her desire to give an appearance of understanding the process after repeated objections by the state during defense counsel's questions on the death penalty.

A review of the voir dire transcript demonstrates that when first asked her view of the death penalty, Ms. May responded she was "absolutely" in favor of it. However, the whole of her responses indicates she would not automatically impose a death sentence, but would need to hear all the penalty phase evidence, including mitigating circumstances, before deciding which sentence was appropriate. Ms. May replied in the affirmative when asked whether she would be open to "every possible mitigating circumstance that could be presented" before reaching a decision, and likewise expressed willingness to first determine whether defendant was intellectually disabled and therefore exempt from capital punishment. When examined by the defense, Ms. May clarified that her sentencing decision would depend strictly on the evidence presented. When defense counsel posed a factual scenario in which a defendant was found guilty of first degree murder and the state had established aggravating factors, without mention of any mitigating circumstances, Ms. May opined death would be the appropriate penalty. However, after the court clarified for the entire panel that jurors are required to consider all mitigating circumstances in the penalty phase, it became apparent that her response to the defense hypothetical could not fairly be viewed as a retreat from her earlier testimony in which she stated she would consider all the evidence and remain open to mitigating circumstances.

Throughout voir dire, defense counsel's questions to members of the venire who initially identified themselves as more supportive of the death penalty gave rise to objections from the state and repeated interjections from the court as to the requirement for consideration of mitigating circumstances. The trial court also

expressed frustration over defense counsel's questioning:

> All right. Well, there has been a pattern of defense counsel asking the question, and, frankly, it's a very long compounded question, and then you ask, "Is that your answer?" without actually allowing them to answer. I mean their answer is basically a yes or a no. And so that's the problem that I have with the way that you are phrasing the question. You are giving them a very long compounded question and asking them, "Is that your answer?" So I don't think that the record is going to reflect based on your questions the potential juror's true feelings and opinions about the death penalty.
>
> I can continue to give them the instruction to include or to consider all mitigating circumstances. We can do it the long way or you can include that and allow them to expand on their answers, but you are really not giving them much opportunity to give their response. You are supplying the answer for them on many of these questions. And I'm going to look at the totality of their responses as is the Supreme Court should they have an opportunity to review this record, and it's the totality of their responses that are important.
>
> A trick question leading a person who has never been in this situation before into saying, "Uh-huh, that's my response" is not really helpful to the process….

That Ms. May was open to the possibility of a life sentence was apparent from her response to defense counsel's effort to clarify her earlier inquiry, in which Ms. May stated: "For me I believe in the death penalty, but what I said was I want to hear everything, and then I would make my decision." When further pressed, she reiterated her open-minded stance.

The whole of her voir dire responses indicates that Ms. May was willing and capable of remaining impartial and correctly applying the law supplied by the judge. Accordingly, the trial court did not erroneously deny defendant's challenge for cause.

**Anita Rainer (Assignment of Error #18)**

Defendant argues Anita Rainer's voir dire answers also reveal she was substantially impaired from considering a life sentence for a defendant who is found guilty of first-degree murder.

Ms. Rainer stated she believed the death penalty was appropriate only in certain

51

cases and rated herself a "3," meaning she was open to both sentences, would listen to all evidence, and would make her decision based thereon. When questioned by the defense about whether she would automatically vote for a death sentence in a case in which the victim was over age 65 and killed intentionally during a burglary, Ms. Rainer responded "[f]or that type of crime and everything was laid out, I mean he studied it, the intent, death penalty would be it. I mean if everything was out there on board and I could see it straight, I would lean toward the death penalty." She then stated that, rather than "lean" toward the death penalty, she would actually go for it if convinced that the perpetrator had "studied," i.e., planned the killing. In later questioning, however, Ms. Rainer stated, if chosen, she would honestly consider any mitigating circumstances before reaching her sentencing verdict:

> …I would just have to see how - you know, everything was laid out, but I could go with life, you know, sentence life, but I would just have to really just kind of, you know, go with - see what's laid out there, you know, all the evidence and everything. I would just have to see, but I could, you know - I'm just trying to think here. I would see first and then if I thought instead of the death penalty I could go the life sentence I could.

It became evident during the court's individualized questioning of Ms. Rainer that her earlier answers indicating she would automatically choose death were the result of her misunderstanding of the relevant law:

> The court:    Would you automatically vote for a death penalty under the circumstances I have described?

> Ms. Rainer:  I don't know that I would do an automatic death, no, but it would be - I mean, like I said, if it's already - if the person is found guilty of first-degree murder and it says by law that he is death penalty, yes, I could do that. That is the law.

The court promptly clarified that the law never requires the imposition of the death penalty and Ms. Rainer subsequently reiterated her ability to honestly consider both sentences before making a decision. The trial court denied the challenge for cause, noting that Ms. Rainer rated herself as a "3," meaning she was open to both sentences,

and the totality of her responses indicated she was equally open to either sentence. The court stated "in response to some of the defense questions she indicated that she would be predisposed to death penalty at best, but again predisposition does not disqualify a juror." The court further stated Ms. Rainer's responses as a whole indicated she is a very neutral prospective juror, and her responses indicated she would seriously consider each option of life in prison or a death penalty, and her responses show consistently that she would have to see and hear everything and that she would consider all the evidence that was presented.

After a review of the transcript, based on the totality of her voir dire responses, we find no error in the trial court's denial of defendant's challenge for cause.

**Lena Key (Assignment of Error #19)**

Defendant argues his cause challenge as to Ms. Key should have been granted. Defendant asserts although Ms. Key initially characterized herself as undecided about the death penalty, during the course of voir dire she demonstrated an inability to meaningfully consider a life sentence for an intentional murder.

Ms. Key initially described herself as undecided on whether she supports the death penalty and rated herself as a "2." When questioned whether, once the state had proven the elements of first degree murder beyond a reasonable doubt she would "absolutely" impose the death penalty, Ms. Key stated she would instead listen to all the penalty phase evidence and consider both options before deciding. Ms. Key testified further she thought the death penalty was appropriate for first degree murder but confirmed she would, based on the facts presented, determine whether it was appropriate under the circumstances. When questioned by defense counsel whether, in a scenario where she had been selected as a juror and found the defendant guilty of first degree murder of a victim over age 65 and committed during a burglary, Ms. Key stated she would consider a sentence of life or death and would not automatically vote

53

for death. But when pushed further, Ms. Key gave a somewhat confusing and entirely inconsistent answer indicating she believed death was the only appropriate penalty in those circumstances. When later examined individually by the court, however, she stated unequivocally that, if chosen, she would honestly consider any mitigating circumstances before deciding which sentence was appropriate.

> The court: …So my question to you, Ms. Key, is if you got to the sentencing portion, before you decided what the appropriate sentence should be, whether it is the death sentence or whether it is a life sentence, your individual thought, before you decided that for yourself would you consider all the mitigating circumstances that were offered to you?

> Ms. Key:    Yes, sir.

> The court:    Would you give them honest consideration?

> Ms. Key:    Yes, sir.

> The court:    Okay. In the situation that I described where the defendant was found guilty of first-degree murder because he had specific intent to kill during a burglary, during a robbery, specific intent to kill or inflict great bodily harm on more than one and the victim was over age 65, some or all of that, could you honestly consider a life in prison sentence for that defendant?

> Ms. Key:    Yes, sir.

> The court:    You could?

> Ms. Key:    Yes, sir.

> The court:    Could you consider a death penalty for that person?

> Ms. Key:    Yes, sir.

> The court:    As you are sitting here today - - and I'm not asking you if you get there how you are going to vote because that would be an inappropriate question for you. But as you are sitting here today, could you tell me if you have a tendency to lean one direction or the other in the case that I described to you, specific intent to kill during a burglary, during a robbery, age over 65 or specific intent to kill and inflict great bodily harm on more than one?

> Ms. Key:    Intent to kill because he hurt more than one.

> The court:    Okay. So what would be your tendency in that sentence?

Ms. Key:    With intent to kill more than one or he killed more than one, if it were just one I would sentence him.

The court:    Okay. Explain that to me a little bit.

Ms. Key:    You know, like if he just killed one like burglary, I say sentence him, you know, give him time.

The court:    The life sentence?

Ms. Key:    Yes, sir, because, you know, he probably just act - - you know, because he got caught. But, you know, if he killed more than one, I sentence him death.

The court:    Would you automatically sentence a defendant to either life or death without considering all the mitigating circumstances?

Ms. Key:    I would consider it.

The court:    You will consider it?

Ms. Key:    Yes, sir.

The court:    Would you give it honest consideration?

Ms. Key:    Yes, sir.

In denying the defense challenge for cause, the court found the inconsistencies among Ms. Key's responses attributable to confusion, rather than an inability to fairly consider all the evidence:

> Okay. With regard to Ms. Key, she did seem to be somewhat confused about the process initially. She did give some responses that were rather confusing to the court which indicated to the court that she didn't really understand how the process worked and the law pertaining thereto, but she was very consistent with regard to her willingness to be open to consider both sides. They were some times (sic) inarticulately given which is again the reason why I had her brought in for individual voir dire . . . .

> After the court examined her it was very clear to the court that under the circumstances alleged in this case of first-degree murder during burglary, robbery, more than one or over the of 65 that she could consider a life imprisonment or a death penalty.

> Some of the comments that I have written down for her is, "Yes, I could consider giving life or death under the circumstances of this case." She rated herself as a 2. She did indicate that she would favor death at some point in her responses, but she also indicated that she could give serious

consideration to mitigating circumstances and impose life imprisonment as well.

I really think that some of her responses were indicative of either not understanding the question or being led, one or the other, which again is why I purposefully asked very open questions to find out her and the other prospective jurors' opinions on these issues. And the court is convinced that Ms. Key will give a serious and honest consideration to both [sentencing options].

A review of the entire voir dire record demonstrates that the trial court did not erroneously deny the defense challenge for cause to Ms. Key.

**Cynthia Bates (Assignment of Error #20)**

Defendant argues juror Cynthia Bates was unable to decide the issue of mental retardation, leaving her ability to properly follow the law substantially impaired.

When examined by defense counsel, Ms. Bates initially responded she did not agree with the law on intellectual disability in capital cases and elaborated her concerns about applying the law:

Defense counsel:   Ms. Bates, how do you feel about that law?

Ms. Bates:   I don't agree with it.

Defense counsel:   Would it be a problem for you if you were on a jury and the trial proceeded to a penalty phase and that evidence was presented to you, is that something that you would have a hard time following?…

Ms. Bates:  No, I wouldn't have a problem. I mean, I don't agree with the law, but the law is the law.

\*\*\*

Defense counsel:   Would you be inclined to find the defendant not mentally retarded because you don't agree with the law?

Ms. Bates:   I don't see how I can say somebody is mentally retarded. I don't see how I can say somebody is that. Even if I have the evidence - I don't see how I can tell how somebody is going to be retarded. I mean, whether you have evidence in front of you, I mean, how could - I'm not a doctor. I'm not - I don't know how you're supposed to…say.

Defense counsel:   So that would be a decision that you would have a difficult time making? Because if you were selected to serve as a juror, you would be asked to make that determination, if this case were to proceed to a penalty phase.

> Ms. Bates:  To decide if somebody was mentally retarded, yeah, I would have a problem trying to decide if somebody - yeah, I'd have a problem with it.

When the court further questioned Ms. Bates, after having explained the evidentiary and fact-finding process by which jurors reach a determination as to intellectual disability, Ms. Bates confirmed that her difficulty was limited to concern about how she, as a layperson, might make a mental health diagnosis. She verified she would not be inclined to make a finding, in the event that defendant had actually established his intellectual disability, that he was not intellectually disabled so that he may be put to death.

In denying the defense challenge for cause, the trial court found that Ms. Bates ultimately indicated she could accept the intellectual disability law and possessed reservations only as to how the conclusion would be reached by the jury. The court reasoned that such a concern was one that "probably just about anybody would have," and one which Ms. Bates, if chosen, appeared fully capable of handling "like anyone else would." Viewing Ms. Bates' responses as a whole, we find the trial court did not abuse its discretion in denying the defense challenge for cause.

**Anita Rainer (Assignment of Error #21)**

Defendant argues Anita Rainer should have also been excluded because she would hold defendant to a higher burden of proof for mental retardation than what the law requires, and thus could not follow the law.

During voir dire, the prosecutor and Ms. Rainer engaged in the following exchange:

> Ms. Rainer:  …I have got to know without a doubt, you know, if the person is retarded or not.
>
> Prosecutor:  Okay. That's a level of certainty that you want, right?
>
> Ms. Rainer:  Yes, sir.

> Prosecutor: There are certain legal standards to which things have got to be proven in criminal court, and you will hear a lot of this, okay? And clear and convincing is one that you will hear. Beyond a reasonable doubt is one that you will hear. What I hear you telling me is that you want to be convinced of it very, very much. Is that correct?
>
> Ms. Rainer: True.
>
> Prosecutor: If the law said that it had to be something less than a hundred percent certainty, do you think you could make that decision or do you think that for you personally you would have to be a hundred percent certain before you could find somebody mentally retarded?
>
> Ms. Rainer: I would have to make a hundred percent sure that they are not.

After further explanation from the prosecutor regarding the meanings of the burden of proofs, Ms. Rainer agreed she would not require a level of certainty beyond what the law requires:

> Prosecutor: ...It's not that you are a doctor. It's not that you have conducted the tests and all that. Does that make it simpler for you?
>
> Ms. Rainer: Yes.
>
> ***
>
> Prosecutor: Would you require a level of certainty beyond what the law requires –
>
> Ms. Rainer: No.
>
> Prosecutor: –meaning would you have to be more sure than that level of certainty the judge said was necessary?
>
> Ms. Rainer: Just what the judge said, just what is necessary.

After review of the record, we find no error in the trial court's refusal to excuse Ms. Rainer for cause. Rather than indicating she would require the defense to carry a heavier burden than the law requires, Ms. Rainer's initial dialogue with the prosecutor appears to show that she would have wanted to be certain defendant was not intellectually disabled before she could consider imposing a death sentence: "I would have to make a hundred percent sure that they are not [intellectually disabled]." Additionally, after further examination, Ms. Rainer expressed that she would follow

the law as provided by the judge. In light of the totality of her voir dire responses, the record shows the court did not erroneously deny the challenge for cause as to Ms. Rainer.

**Jennifer McMullen (Assignment of Error #22)**

Defendant argues the trial court erred in denying his challenge for cause as to Jennifer McMullen because she could not adequately consider the mitigating factors of a difficult childhood and a follower.

When initially questioned, Ms. McMullen disclosed she considered herself as being "for" the death penalty in some cases, and rated herself a "2," stating, "I believe there are certain acts where the death penalty is appropriate, …but, you know, I don't know yet what the facts would be so I would be able to consider life as well." When pressed further, she stated that in a case in which specific intent was proven, the murder occurred during a robbery, and the victim was over the age of 65, she didn't know that she would be "50/50" under those "extreme" circumstances, but that she was still open to a life sentence. When questioned by the defense as to how she would vote in such a case, Ms. McMullen indicated she would be more likely to impose the death penalty, stating, "… I don't know if I could say 100 percent, but, you know, if it were a crime, a premeditated crime against an elderly person, I could consider the life [sentence], but I don't know that there would be much of a margin for the life there," before verifying that her decision, either way, would not be automatic.

After the trial judge re-instructed the panel as to the law on mitigating circumstances, Ms. McMullen expressed a willingness to follow the law although she was still predisposed to the death penalty: "I mean if the judge says you have to look at these circumstances and consider them, you know, I would want to do what was according to the law, but I do believe that I would be predisposed to opting for the death penalty." She further explained that she would never say someone would

59

automatically be sentenced to death, but she favors the death penalty. Ms. McMullen admitted she was unsure what sort of circumstances would cause her to gravitate toward a life sentence, and indicated she may not give much weight to evidence that defendant had a "horrible childhood" because her own father had suffered similar circumstances but "didn't opt to [kill]." Ms. McMullen further expressed that she was unsure whether evidence of a difficult childhood would make a difference.

The court subsequently conducted additional individual voir dire of Ms. McMullen:

The court: Now, what I want to know is, can you tell me that you will honestly consider all the mitigating circumstances in a case before you arrive at your individual sentence?

Ms. McMullen: Yes, if that's what you instruct me to do, I have to.

The court: Okay. But what I'm asking you is, would you honestly do that? It's going to be the instruction, but what I want to know is will you actually consider those circumstances.

Ms. McMullen: I mean, yes, I would have to. I think it would be the right thing to do, you know.

The court: When you say, " I have to do" do you have to because I told you you had to –

Ms. McMullen: No.

The court: – or in your mind do you have to because –

Ms. McMullen: I have to.

The court: And would you automatically vote for a death penalty in the circumstances that I have just described to you or would you consider also a life in prison?

Ms. McMullen: I don't – I don't believe I would automatically.

The court: You don't believe you would automatically what?

Ms. McMullen: Consider. I mean I don't think I would automatically vote for the death penalty. I mean I'm trying to go down – it's hard to generalize when – I know what you are saying about the case has been, you know, decided up to a certain point with my fellow jurors, but it is – you know, it's just hard for me to say yes or no were I in that situation.

60

The court:   Absolutely, And none of us here are trying to get you to tell us what you are going to vote because frankly you don't know.

Ms. McMullen:   Right, right.

The court:   It would be inappropriate for any of us to ask you how you are going to vote if you are in the situation. That's not what we are here to do. What we are here to do is to find out if you would give honest consideration to the two possible sentences in the event that you were in that situation.

Ms. McMullen:   I mean, yes, I think I would.

The court:   Would you honestly consider a death penalty as a possible verdict?

Ms. McMullen:   Yes.

The court:   Would you honestly consider a life in prison as a possible verdict?

Ms. McMullen:   Yes.

The court:   Would you be substantially impaired from imposing either one of those sentences?

Ms. McMullen:   I don't think so, no.

In denying the challenge for cause, the trial court found Ms. McMullen qualified to serve impartially and found that she clearly indicated an ability and willingness to consider everything required by law. The overall tenor of Ms. McMullen's voir dire responses demonstrated that she took her responsibilities seriously and gave consideration to her answers. That, when probed in the abstract, she indicated she would perhaps not have given some mitigating circumstances as much weight as defendant would have liked is not an indication of her unsuitability for service. La. C.Cr. P. art. 797. Viewing Ms. McMullen's responses as a whole, we find the trial court did not abuse its discretion in denying the challenge for cause.

## DUTY TO INQUIRE INTO DEFENDANT'S ASSERTION OF
## RIGHT TO TESTIFY
### (Assignment of Error #8)

Defendant claims he was denied his fundamental right to testify, despite having

requested to testify at the close of the penalty phase. Defendant asserts his attorneys prevented him from taking the stand and the trial judge failed to make a proper inquiry into his desire to exercise this fundamental right.

The record in this case reflects that after both sides rested in the penalty phase, court resumed the following morning. The trial court asked if either the state or defense had anything to put on the record before closing arguments began. Both sides responded negatively. The trial resumed with closing arguments from the state and defendant. Immediately prior to instructing the jury, the defendant expressed a desire to speak:

Defendant:  Excuse me, Your Honor. I have question I want to ask you please, sir.

Court:  Excuse me.

Defendant:  Your Honor, I would like to address the Court myself. Is there any kind of way that I can take the stand at this point right here?

Court:   No sir. The trial has concluded.

Defendant:  I want to take the stand in my penalty phase, Your Honor. Do I have a right to speak before my sentence is cast upon me?

Court:  You had a right to speak, sir, but the penalty phase is concluded.

Defendant:  But according to my attorneys I was waiting and trying to address the Court before the State took the stand and I wanted to address the Court. My attorney denied me the right myself to address the jury before the State took the stand, Your Honor.

Court:  Sir, we have been here, you have been present during all of these proceedings. You knew that the penalty phase is concluded. In fact, at the close of the last night I asked if there was any motions for either side, and I informed each side that that was the final time to propose any motions. The State said they had none, the defense said they had none. I made it very clear that closing arguments would take place at 9:00 o'clock this morning. We were here, I asked if there was anything to be put on the record before the jury came in. The State had nothing, the defense had nothing. The closing arguments have been made and I am going to instruct the jury. This case is concluded, sir. And if you wanted to take the stand you certainly had the right to do that. You've been here before, you know how this process works. You have five attorneys representing you, and there is no question in my mind that you knew that

you had the right to do that.

Defendant: No, sir.

Court: And you did not do that. And the case is now concluded, and I will instruct the jury when we come back at five minutes until.

Undoubtedly, a criminal defendant has the right to take the witness stand to testify in his own defense. *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 2709, 97 L.Ed. 2d 37 (1987). However, that right is not unqualified, and the Supreme Court has recognized that the "right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Rock*, 483 U.S. at 55. Further, the Court noted that "numerous state procedural and evidentiary rules control the presentation of evidence, and do not offend the defendant's right to testify." *Id*. at 55 n. 11.

Louisiana limits testimony to the evidentiary stage of trial, and the trial court has discretion to permit the introduction of additional evidence prior to argument. *See State v. Celestine*, 443 So. 2d 1091, 1096 (La. 1983); *State v. Bonnano*, 373 So. 2d 1284, 1292-93 (La. 1979); *State v. Peer*, 189 La. 795, 180 So. 640, 642 (La. 1938); *State v. Hackett*, 166 La. 261, 117 So. 141, 142 (La. 1928); La. C.Cr. P. art. 765(5).[16] In *State v. Dauzart*, 99-3471 (La. 10/30/00), 769 So. 2d 1206, this court discussed arbitrary application of this rule. In *Dauzart*, defense counsel called a final witness at the close of its case for purposes of identifying medical records. A recess followed after which defense counsel informed the court he would rest subject to introducing the medical records. The court immediately ordered the records introduced, excused the jurors and then met with counsel to cull out the relevant documents. 769 So. 2d at

---

[16] La. C. Cr. P. art. 765 (5) provides:
The normal order of trial shall be as follows:
\*\*\*
(5) The presentation of the evidence of the state, and of the defendant, and of the state in rebuttal. The court in its discretion may permit the introduction of additional evidence prior to argument.

1209. Additionally, a discussion was held regarding the court's general charge to the jury, during which counsel informed the court that defendant "has thought about it and decided he wishes to take the witness stand." The trial court denied defendant's motion to reopen his case. On the following morning, trial resumed its normal course from closing argument to the court's jury instructions, and the jury's verdict. *Id.* This court reversed the conviction, holding the trial court's refusal to reopen the defendant's case for the defendant's testimony after the defense had rested was an abuse of discretion and violated the defendant's due process right to testify. *Id.* We found the court arbitrarily refused to allow the defense to reopen its case "under circumstances in which the slight deviation from normal practice would have had no impact on the orderly flow of trial from jury selection to verdict and in which strict adherence to the order of trial specified by art. 765(5) cost relator his only opportunity to face jurors and persuade them of his version of events." *Id.* at 1208. In so doing, this court further explained:

> Louisiana limits testimony to the evidence-taking stage of trial. La. C.Cr. P. art. 765(5). Applied to the accused, this rule of procedure simply imposes a commonsense requirement that the right to testify be exercised in a timely fashion. In the present case, timeliness was foremost in the mind of the trial judge when he steadfastly refused to allow the defense to reopen its case, after it had ostensibly rested, for purposes of allowing relator to testify, as counsel had committed him to do so in his opening remarks to the jurors.
>
> However, restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve. The order of trial specified in La. C.Cr. P. art. 765(5) does not generally impose an arbitrary restriction on the accused's right to testify because the court also possesses the discretion under the statute to reopen the evidence at any time before closing arguments to permit the taking of additional testimony.

*Id.* (Internal citations omitted). Unlike the circumstances in *Dauzart*, in this case defendant did not express a desire to testify until after the close of evidence and *after* closing arguments in the penalty phase by both sides. Under these circumstances, we

find defendant's request to testify was untimely and we find no error in the trial court's refusal to allow him to testify at that point in the trial.

Additionally, we do not find the trial court violated a duty to inquire into the defendant's right to testify. In *State v. Hampton*, 00-0522 (La. 3/22/02), 818 So. 2d 720, this court established criteria to aid trial courts in determining whether a defendant has waived his right to testify or simply chose not to do so for strategic purposes:

> (1) absent extraordinary circumstances that should alert the trial court to a conflict between attorney and client, the court should not inquire into a criminal defendant's right to testify. The court should assume, that a criminal defendant, by not "attempting to take the stand," has knowingly and voluntarily waived his right;

> (2) the court must consider whether the petitioner has waived his right to testify.... [The defendant can only] rebut that presumption ... by showing that his attorney caused him to forego his right to testify [ (a) by alleging specific facts, including an affidavit by the defendant's trial counsel] from which the court could reasonably find that trial counsel 'told [the defendant] that he was legally forbidden to testify or in some similar way compelled him to remain silent ... [ (b) by demonstrating from the record] that those specific factual allegations would be credible ...

818 So. 2d at 729-30 (citing *Passos-Paternina v. United States*, 12 F.Supp. 2d 231 (D.P.R.1998); *see also State v. Shaw*, 06-2467 (La. 11/27/07), 969 So. 2d 1233,1246.

The record indicates that timeliness was foremost in the trial judge's mind when he refused to allow defendant to take the stand after each side had rested its case in the penalty phase and submitted its closing argument. As the trial judge found, defendant did not seek to testify until after the penalty phase concluded and the court had already asked both parties more than once whether they had anything further to present and was met with negative responses. Defendant offers nothing from the record to justify his delay in seeking to testify but merely intimates that his attorneys prevented him from speaking up sooner. Considering the guidelines set forth in *Hampton*, defendant has failed to rebut the trial court's finding that he waived his right to testify.

The defense also relies on some general remarks made by defendant prior to trial as indicative of his desire to testify. Before counsel was assigned to this trial, defendant stated in court "I would like to invoke my Fifth Amendment, if I would please, to participate in any proceedings that come before this case...." Defendant also submitted a pro se motion to suppress, which included his request to testify at the suppression hearing. Nothing in these pretrial remarks express a desire to testify or indicated an attempt to take the stand at trial. Further, we note that defendant did testify at the suppression hearing per his request. Additionally, defendant points to unsolicited comments made by his brother, Bradley Brumfield, during his testimony at the penalty phase, wherein Mr. Brumfield stated: "Y'all might not see Robert talking over there, and he might be sitting there still, I know he wants to say something…." However, defendant made no statement at that time that he wanted to testify on his behalf. The first indication that defendant wanted to testify was after closing arguments were completed and the trial court was ready to instruct the jury. These vague pre-trial statements by defendant were insufficient to assert his right to testify. We find no error in the trial court's ruling.

## PENALTY PHASE

### INCONSISTENT EVIDENCE / THEORIES AT PENALTY PHASE
### (Assignment of Error #10)

Defendant asserts the state violated his right to due process, a fair and reliable sentencing, and his right to counsel by presenting an inconsistent theory and inconsistent evidence of the Terrance Blaze homicide at the penalty phase of his trial. Defendant argues he is entitled to a new penalty phase because the state was allowed to present testimony from its bloodstain expert, Mark Rogers, which contradicted testimony he gave at both defendant's first trial and at co-defendant Brandy Holmes' trial, despite the state's notice and assurances that the evidence presented at the

66

penalty phase would be identical to that presented in defendant's first trial. Specifically, Rogers' testimony in the penalty phase implicated defendant as the shooter in the Blaze homicide, contradicting testimony he gave during defendant's first trial and at Brandy's trial which implicated Brandy as the shooter. We find merit in this assignment of error.

Generally, evidence of other crimes, wrongs, or bad acts is not admissible at trial to prove a defendant's bad character. La. C.E. art. 404(B). In *Prieur*, this court held that such evidence is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." 277 So. 2d at 128. However, the state can introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1). Moreover, the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. Separate and apart from the showing of relevancy and prejudice, the state must also prove the defendant committed the other acts, and satisfy the requirements set forth in *Prieur*, i.e., the state must provide the defendant with notice before trial that it intends to offer prior crimes evidence. *State v. Garcia*, 09-1578 (La. 11/16/12), 108 So. 3d 1, 39.

However, unlike the guilt phase of a trial, the character of the defendant is automatically at issue in a capital sentencing hearing. La. C.Cr. P. art. 905.2. Beginning with our decision in *State v. Sawyer*, 422 So. 2d 95, 104 (La.1982), this court held that Article 905.2 authorizes the introduction of evidence of convictions for unrelated crimes at a capital sentencing hearing, even if the defendant does not place his character at issue. This court eventually recognized the necessity of standards governing the admission in the penalty phase of evidence of unrelated and unadjudicated criminal conduct, such as had been set forth in *Prieur*, with regard to

the admission of other crimes evidence in the guilt phase of trial. In *State v. Brooks*, 541 So. 2d 801 (La.1989), we held that before the state can introduce evidence of unrelated and unadjudicated criminal conduct in the penalty phase, the trial judge must determine that: (1) the evidence of the defendant's commission of the unrelated criminal conduct is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the unrelated conduct has relevance and substantial probative value as to the defendant's character and propensities. 541 So. 2d at 814.

We revisited the issue in *State v. Jackson*, 608 So. 2d 949 (La. 1992), wherein we reaffirmed the standard set forth in *Brooks*, and also limited the type of evidence admissible to criminal conduct which involves violence against the person of the victim, and to that conduct for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for the first degree murder for which he is being tried. 608 So. 2d at 955. We further reiterated that due process requires that when a prosecutor intends to use evidence of unrelated criminal conduct in a capital sentencing hearing to increase the punishment for the charged crime, the defendant must be notified so that he can prepare to rebut or defend against the evidence. *Id*. at 957. This court explained that "adequate notice, sufficiently detailed to allow the defendant to know the exact unrelated conduct he must be prepared to meet in the sentencing hearing and sufficiently in advance of trial to allow reasonable preparation of a defense, is essential to provide meaning to the defendant's corresponding due process right of a reasonable opportunity to be heard at the capital sentencing hearing." *Id*. The hearing to determine whether other crimes evidence is admissible in the penalty phase is often called a "Jackson" hearing. *State v. Draughn*, 05-1825 (La. 1/17/07), 950 So. 2d 583, 606.

The state provided the required *Jackson* notice relative to defendant's first trial, and a *Jackson* hearing was held to determine the admissibility of that evidence. Prior

to the retrial, defendant filed a motion seeking an amended *Jackson* notice from the state. During a pretrial motion hearing, the state opposed the motion, asserting there was no need to file a new *Jackson* notice because one had been filed in the first trial and the evidence would be the same. The prosecutor stated:

> Your Honor, our reasons to that is that there was a *Jackson* Notice filed in it, and the *Jackson* evidence in this case remained the same. We do not see a need to amend it. We have already litigated this issue, and we're not seeking to relitigate the same. Our reliance on the record is that not only are they given a *Jackson* notice, they're given a very fully developed, exactly what the witnesses said in the last trial notice, when you couple the notice that was filed plus the trial transcripts, they're on kind of an uber notice, and we don't see a need to amend it.

The court granted the defendant's motion "out of an abundance of caution." The state subsequently filed a supplemental *Jackson* notice that it intended to introduce evidence of defendant's prior criminal convictions as previously noticed, as well as evidence that defendant participated in and committed a homicide upon Terrance Blaze on or about January 2003, within days of the instant offense. At a pretrial hearing on that same day, the state advised the court that it had filed the supplemental notice. The prosecutor stated:

> I had filed another supplemental *Jackson* notice alleging that we intend to prove the defendant's involvement in the Terrance Blaze homicide. We intend to use exactly the same testimony that was previously adduced, and I re-alleged his two prior convictions, to which he's already admitted in open court during the course of this hearing. So I'll defer to defense counsel if there is anything else about the notice that they now deem to be defective.

The state further clarified that the notice "identified the prior convictions that we intend to use and alleges the date of the homicide, incorporates only by reference the transcript since that gives very precise notice of exactly what testimony we would adduce to meet our burden under *Jackson*." The state also confirmed once more that it intended "to present exactly the same penalty phase evidence."

Despite the state's notice and repeated guarantees to defendant and the court

that the evidence and testimony would be identical to that previously set forth, the state intentionally presented contradictory testimony that defendant, not Brandy, shot Blaze in the back of the head.

During the state's opening statement during the penalty phase, the prosecutor told the jury that defendant and Brandy killed another person, and that Mr. Blaze was shot in the back of the head by defendant. The state then called Rogers as a witness to present testimony regarding defendant's involvement in the Blaze homicide. Rogers testified he was able to reconstruct the Blaze crime scene after examination of photographs of the vehicle in which Blaze was shot and examination of blood found on a pair of jeans and boots belonging to the defendant. The evidence indicated defendant was seated in the driver's seat of the vehicle, Blaze was shot in the back of the head while seated in the front passenger seat, and Brandy Holmes was seated in the back seat of the vehicle. Rogers testified:

> Q (prosecutor): Do you have an opinion about the configuration of Mr. Blaze's body when that blood was deposited?
>
> A: (Rogers): Yes. From the blood to have been deposited in, on the ashtray as it was, Mr. Blaze would have had to have been looking to his right when the wound was inflicted with the left portion…or the back portion of his head to the left or towards the driver's side of the vehicle.
>
> Q: So he would have been effectively looking in the direction of the right passenger's side window?
>
> A: That's correct.
>
> Q: Now, with respect to the blood that was found on the bluejeans and on the boots, do you have an opinion about where the person was sitting that, when that blood was deposited?
>
> A: That person would have had to have been sitting to the left of the person in the front seat. Had they been sitting anywhere else in the vehicle the seats would have occluded those bloodstains from being deposited there, and that pattern logically makes sense as a portion of the continuation of the pattern that deposited blood on the right side of the ashtray.
>
> Q: So in your opinion when Mr. Blaze was actively bleeding from his

head wound there would have been a person seated to his immediate left in the driver's seat; is that correct?

A: Well, when the shot was fired, when the wound was inflicted he would have been sitting to his immediate left.

Q: And so the driver's, right side of the driver's jeans and the right side of his boots would have been exposed to that blood?

A: Some of it, yes.

\*\*\*

Q: Based on your review of the evidence that you saw, both within the car as well as on the boots and the pants, is it your opinion that Terrance Blaze was shot in the head while he was seated in the front seat, the passenger's side of that car?

A: Yes, it is.

Q: Do you have an opinion, Captain Rogers, about the placement of the barrel of the gun at the time the wound was inflicted, where the gun might be located?

A: It would be in reasonable close proximity, but I was unable from the information provided to determine a distance.

Q: How about direction? The direction of the gun or the relationship of the position of the gun to the head?

A: It was just about directly behind it.

There is no dispute that this testimony contradicted Rogers' previous testimony. The state admits that at defendant's first trial Rogers testified it was likely the shot came from behind and it was less likely the driver was the shooter.[17] The state likewise admits Rogers unequivocally testified at Brandy's trial that "considering that the blood stains on the right leg, on the ashtray, and on the boot are consistent with high velocity impact spatter and they can also be consistent with expirated blood or blood expelled out of the mouth after it pools, I would put the person inflicting the wound being in the back seat of the vehicle and Mr. Coleman wearing the blue jeans and the

---

[17] *Coleman I,* 06-KA-518, R. 4943.

boot in the front driver's seat of the vehicle...."[18]

Defense counsel cross-examined Rogers, attempting to point out inconsistencies between this testimony and testimony he gave at defendant's first trial:[19]

Q (defense counsel): Captain Rogers, isn't it your opinion that the person that was wearing the jeans and the shoes was not the person who administered the shot?

A: No, that's not my [opinion] at all.

Q: Do you remember testifying at some previous hearings?

A: Yes, I do.

Q: Do you remember testifying that it was less likely that the driver was the shooter, that it was more likely that the shot came from behind in the backseat?

A: I don't recall testifying to that exactly, but it may have been based on other information that I had.

Q: Well, what other information would that have been that you don't have today?

A: I don't, I have more information today than I did then, but I'm not familiar with that exact -

Q: Captain Rogers, I'm going to show you a document where you testified at a previous hearing. Could you read what I have highlighted there? You don't have to read it out loud, just to yourself. Now that you've had a chance to read that is your memory refreshed? . . .

A: Yes, sir.

Q: Do you remember testifying to that?

A: I specifically don't remember testifying to that. I do remember that discussion being held, but based on what I read and the parts in front of and behind that, that answer has given, seems to be inconsistent with the testimony I gave above and underneath that answer.

Q: Okay. But when you were asked, based on where Terrance Blaze received the bullet to his head and based on everything else that we've looked at here, is it more likely in your opinion or less likely that the

---

[18] *State v. Holmes*, 06-KA-2988, R. 6035-36.

[19] According to defendant, because defense counsel was caught off guard by Rogers' testimony, counsel was unable to immediately access transcripts from Brandy's trial. Therefore, defense counsel only used transcripts from defendant's first trial to cross-examine Rogers.

driver was the shooter. Your answer was, I think it was less likely that the driver was the shooter?

A: That's what the transcript reflects, yes, sir.

Q: Okay. But that's not what you said?

A: Once again, that's what the transcript says I said. I can't tell you that the transcript is in error or incorrect, I may have misspoke.

Q: Thank you, Captain.

On re-direct, Rogers explained that the inconsistent statement in his prior testimony was itself in conflict with the remainder of his testimony at the earlier proceeding:

> Q: (prosecutor): Captain Rogers, I would like you to explain to the jury why you would think that that was a misspeak on your part.
>
> A: Based on the information that prior to that response I was discussing the bloodstains on the driver's pants leg and on the driver's boot, and below that I was discussing the, where Mr. Blaze was sitting and where he was looking when the wound was inflicted, so incorporating all of that together, that response that it was less likely the driver was the shooter seems to be inconsistent with the other testimony that I gave. So once again, I don't know if I misspoke or if I was misinterpreted when I spoke, I don't know which one of those two things it is, but it seems to be inconsistent within the transcript.
>
> Q: Do you have an opinion about whether the driver was the shooter?
>
> A: Yes, I do.
>
> Q: And what is your opinion?
>
> A: I believe the shot originated from the driver's area of the vehicle with Mr. Blaze looking to his right with the rear aspect of his head presented to the driver's area of the vehicle.
>
> Q: And what do you base that opinion on?
>
> A: The fact of the very small spatter that's consistent with back spatter that's present on the right side of the ashtray and on the right leg and right boot of the bluejeans and the boot.

Although defendant did not lodge a contemporaneous objection to Rogers' testimony, he objected and moved for a mistrial the following day, arguing the state should not have been allowed to present this completely different theory and

73

inconsistent evidence regarding the shooter in the Blaze homicide. The trial court ruled the motion was untimely, and further stated defendant had ample time to cross-examine Rogers. The court noted defendant had a full staff of attorneys, had access to all of the prior transcripts, and did cross-examine Rogers on the inconsistencies. Further, the court stated it would allow defendant to call Rogers as a witness in his penalty phase case.

Based on the facts of this case, it is clear the state failed to provide defendant with sufficient notice of the other crimes evidence it intended to introduce at the penalty phase. Pursuant to *Jackson*, the defendant is entitled to notice of the "exact unrelated conduct he must be prepared to meet." 608 So. 2d at 957. While the state's written *Jackson* notice gave notice that "defendant participated in and committed a homicide upon Terrance Blaze," the state purposefully misled the defendant concerning the evidence it intended to present at the penalty phase and gave defense counsel numerous assurances that its penalty phase evidence and testimony would mimic what it presented at defendant's first trial. The state even emphasized that because defendant was in possession of the previous trial transcripts, he had "uber" notice of the evidence and testimony that would be presented. The state's representations were effectively part of the *Jackson* notice. Thus, Rogers' testimony that defendant was the shooter in the Blaze homicide did not conform with the *Jackson* notice provided by the state.

This court reviews a *Jackson* error for harmless error. *Tart,* 672 So. 2d at 132. The inquiry is whether the capital sentence actually rendered in this trial was surely unattributable to the error. *Id*. In *State v. Langley*, 95-1489 (La. 4/14/98), 711 So. 2d 651, 667, this court stated, relative to the admission of other crimes evidence at the penalty phase:

A defendant must show a "substantial risk of grave prejudice" arising out

of inadmissible or surprise admission of other crimes evidence. The purpose of limiting evidence of unadjudicated criminal activity is to prevent surprise, undue prejudice, and the injection of an arbitrary factor into the jury's deliberations. There is no presumption of prejudice.

We find defendant demonstrated undue prejudice due to the lack of proper notice of the other crimes evidence.

Because defendant did not have notice of the change in Rogers' testimony, defendant was not able to prepare a defense to the assertion he was the shooter in the Blaze homicide. Notably, because the state assured the court and defendant the evidence would be exactly the same as it previously presented, the court did not conduct a new *Jackson* hearing. Thus, there was not a determination made by the court as to whether Rogers' new testimony and opinion met the clear and convincing standard of proof. Because defendant was not provided with proper notice, he had no forensic experts in place to challenge Rogers. Further, defendant had no line of cross-examination prepared to challenge Rogers' opinion or the science on which his opinion was based. While defense counsel attempted to point out the inconsistencies in Rogers' testimony on cross-examination, counsel could not effectively challenge Rogers' actual opinion that defendant was the shooter. The surprise was not "cured" simply because defendant was allowed to cross-examine Rogers.

Moreover, we find it likely that evidence defendant was the actual shooter in the Blaze homicide thwarted defendant's reliance on residual doubt going into the penalty phase and defendant's penalty phase argument that he was merely a follower of Brandy Holmes. Because the evidence presented defendant in a more culpable light before the jury, we cannot say this evidence had no effect on the sentencing decision. The state's presentation of evidence that defendant was the shooter in the Blaze homicide allowed the state to argue defendant deserved a more severe punishment than a life sentence. At the closing of the penalty phase, the state argued:

75

He deserves worse, he has done worse. He deserved a life sentence as soon as you said he was guilty of first-degree for which we thank you, he's at a life sentence, well, what about the death of Terrance Blaze. Does that not warrant some greater consideration of a more severe penalty? Does that not say, you know what, life in prison satisfies some sense of justice, but, you know, he didn't just kill one person, and he didn't just do it in a snap decision. He did it savagely, he did it deliberately, and he did it twice. And he already came to that day having committed an armed robbery, having committed other crimes. That's' simply not enough to say, but you, sir, are the same as these other people who may have only made one mistake or made a series of smaller mistakes. This is worse, this is more deserving of our ultimate penalty.

Because the sentencing hearing focuses on the character and propensities of the offender, the issue of relative culpability is a critical issue in the penalty determination. There is no doubt the state's portrayal of defendant as the actual shooter in the Blaze homicide, rather than merely a principal, impacted defendant's sentencing phase mitigating factor of lesser involvement in the offense and thus was arguably material to the jury's penalty determination. *See Bradshaw v. Stumpf*, 545 U.S. 175, 187, 125 S.Ct. 2398, 2407-08, 162 L.Ed. 2d 143 (2005). There is more than a reasonable probability that the jury may not have reached a unanimous decision of death had they not heard evidence that defendant was the actual shooter in another homicide. In *State v. Comeaux*, 93-2729 (La. 7/1/97), 699 So. 2d 16, 22, this court stated: "Just as the Supreme Court of the United States in *Gregg*[20] established safeguards … necessary for the valid imposition of a death sentence, this court has established significant safeguards against the wanton and freakish imposition of capital punishment when the prosecution offers evidence of unrelated and unadjudicated criminal conduct." One of these safeguards is the requirement of proper notice to the defense. The state's failure to comply with this safeguard resulted in a violation of defendant's right to due process.

Likewise, we also find the inconsistent positions taken by the state violated

---

[20] *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed. 2d 859 (1976).

defendant's due process rights. This court has held that due process forbids the state from employing inconsistent and irreconcilable theories to secure convictions against individuals for the same offenses arising from the same event. *Holmes*, 5 So. 3d at 62; *State v. Scott*, 04-1312 (La. 1/19/06), 921 So. 2d 904, 957. The state contends its theory has been consistent - that defendant and Brandy committed these crimes together - and Rogers' testimony does not change that theory. We disagree. In *State v. Lavalais*, 95-320 (La. 11/25/96), 685 So. 2d 1048, this court considered defendant's argument regarding the state's inconsistent positions during the penalty phase. In *Lavalais*, the defendant contended the prosecution violated his due process rights when it disputed at the penalty phase evidence of the mitigating factor that defendant was acting under his co-defendant's domination and control, but presented evidence of the same at the co-defendant's trial. 685 So. 2d at 1056. This court found the state's position in the two trials did not rise to the level of fundamental unfairness. *Id.* at 1056-57. We reasoned that although the state's positions in defendant's trial and the co-defendant's trial may appear inconsistent at first glance, this appearance results from the fact that the state's emphasis as to culpability was different in the two trials. *Id.* at 1056. Contrary to *Lavalais*, the state's actions in this case went beyond the product of the state's argument as to degree of culpability. Here, the state actually presented inconsistent evidence in the form of Rogers' changed testimony regarding the identity of the Blaze shooter based on the forensic evidence. Although the state attempted to explain Rogers' previous testimony as a "misspeak," we cannot ignore that Rogers *twice* testified at two different trials the shot that killed Blaze came from the back seat, thus implicating Brandy as the shooter. We find it unlikely that Rogers simply "misspoke" when he asserted that opinion at both defendant's first trial and Brandy's trial. To allow the state to advance inconsistent evidence and theories of the Blaze homicide directly in contravention of its *Jackson* notice undermines confidence

77

in the fairness and reliability of the sentencing phase of the trial and the death sentence imposed. We find the inconsistencies in the state's position rose to the level of fundamental unfairness and thus infringed upon defendant's right to due process.

The Eighth Amendment requires a heightened need for reliability in the determination that a death sentence is the appropriate punishment in a specific case. *See Caldwell v. Mississippi*, 472 U.S. 320, 323, 341, 105 S.Ct. 2633, 2637, 2645, 86 L.Ed. 2d 231 (1985). "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. N. Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 2991, 49 L.Ed. 2d 944 (1976). The state's presentation of inconsistent evidence and theories of the Blaze homicide and the state's failure to give defendant proper notice of this change in evidence and testimony incurably tainted the sentencing process. Thus, we cannot conclude the defendant's death sentence was surely unattributable to the error. We find the jury's sentencing decision in this case does not meet the standard of reliability required by the Eighth Amendment. The Supreme Court has stated that "although the prosecutor must prosecute with earnestness and vigor and may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 2d 1314. In this case, the state's repeated false representations regarding the *Jackson* evidence it intended to introduce crossed the line to foul blows.

Although we do not lightly reverse the jury's determination, we are obligated to find reversible error for the above reasons. Therefore, we vacate defendant's

sentence and remand this case for a new sentencing hearing.[21]

## DECREE

For the reasons assigned, defendant's conviction for first degree murder is affirmed. Defendant's sentence of death is vacated and set aside and the case is remanded to the district court for a new sentencing hearing.

**CONVICTION AFFIRMED; DEATH SENTENCE REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

---

[21] Because we find this error mandates a new sentencing hearing, we pretermit discussion of the defendant's remaining penalty phase assignments of error.

SUPREME COURT OF LOUISIANA

NO. 2014-KA-0402

STATE OF LOUISIANA

VERSUS

ROBERT GLEN COLEMAN

**KNOLL, J., additionally concurring.**

Although I concur fully in the majority opinion, I write separately to emphasize how critical it is for the State to be forthright and prompt when giving notice of its intent to use "other crimes" evidence during the guilt phase of a capital trial. As the majority opinion points out, we have described "adequate notice" for the introduction of such evidence in a capital sentencing hearing as notice that is (1) "*sufficiently detailed* to allow the defendant to know the *exact unrelated conduct* he must be prepared to meet in the sentencing hearing" and (2) "*sufficiently in advance of trial* to allow *reasonable preparation* of a defense."[1] Here, although the State gave pre-trial notice of its intent to prove defendant's "involvement in the Terrance Blaze homicide," it was not until the State delivered its guilt phase opening statement in the presence of the jury that it indicated it intended to prove—contrary to its theory in Brandy Holmes' trial and its theory in the defendant's first trial—that Mr. Blaze was shot in the back of the head *by the defendant*. Indeed, the notice the State provided in this case was neither "sufficiently detailed" nor "sufficiently in advance of trial" to constitute "adequate notice" for due process purposes.

Given the grave and final nature of capital punishment and the precious resources the people of this State dedicate to ensuring justice is done in these most

---

[1] *State v. Jackson*, 608 So.2d 949, 957 (La. 1992) (emphasis added).

serious cases, the State's unreasonable delay in giving notice concerning such a crucial piece of evidence is indefensible. This practice tends to inject gamesmanship into the proceedings which we will not tolerate. There is absolutely no excuse for this type of practice, especially when the defendant's life hangs in the balance. In my view, the State would have been better off not introducing the expert's testimony at all rather than risking the reversal the law compels us to order in this case. Notwithstanding defendant's opportunity to cross-examine this expert witness, the change in this witness' expert testimony is too critical a change in evidence, and the State's failure to timely notify the defendant of this change is certainly unduly prejudicial to defendant at the penalty phase of trial in a capital case.

Moreover, under these facts, I do not believe defendant's objection and motion for mistrial the following morning was untimely. Given the State's repeated assurances that its penalty phase evidence would be the same as it was in defendant's first penalty phase trial, the changes in the State's theory and in the expert's testimony completely blindsided defendant. Other than a hastily-prepared cross-examination of the expert witness, there was no time for the defendant to thoroughly and thoughtfully prepare a strategy to respond to this unexpected evidence. Thus, in my view, it was not unreasonable for defendant to lodge his objections to the State's failure to notify him of these changes on the following morning when court resumed.

For these reasons, I agree with the majority's decision to grant the defendant a new penalty phase trial.

2

# SUPREME COURT OF LOUISIANA

## NO. 2014-KA-0402

## STATE OF LOUISIANA

## VERSUS

## ROBERT GLEN COLEMAN

*ON APPEAL FROM THE FIRST JUDICIAL DISTRICT COURT*
*FOR THE PARISH OF CADDO*

**WEIMER, J.**, dissenting in part.

I respectfully dissent from the majority opinion insofar as it vacates the defendant's sentence and remands this case for a new sentencing hearing. The general rule is that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence." La. C.Cr.P. art. 841. This rule, commonly known as the contemporaneous objection rule, was extended to apply to the penalty phase of capital trials in **State v. Wessinger**, 98-1234, p. 20 (La. 5/28/99), 736 So.2d 162, 181.

In this case, there is no dispute, and the majority opinion acknowledges, that "defendant did not lodge a contemporaneous objection to Rogers' testimony." Slip op. at 75. As a result, under prevailing jurisprudence, defendant failed to preserve his claim of a **Jackson**[1] violation for review. La. C.Cr.P. art. 841; **Wessinger**, 98-1234 at 20, 736 So.2d at 181.

I would affirm the judgment below in its entirety.

---

[1] **State v. Jackson**, 608 So.2d 949 (La. 1992).

SUPREME COURT OF LOUISIANA

NO. 2014-KA-0402

STATE OF LOUISIANA

VERSUS

ROBERT GLEN COLEMAN

ON APPEAL
FROM THE FIRST JUDICIAL DISTRICT COURT
FOR THE PARISH OF CADDO


GUIDRY, Justice, dissents in part for the reasons assigned by Justice Weimer.

**SUPREME COURT OF LOUISIANA**

**NO. 2014-KA-0402**

**STATE OF LOUISIANA**

**VERSUS**

**ROBERT GLEN COLEMAN**

*ON APPEAL FROM THE FIRST JUDICIAL DISTRICT COURT*
*FOR THE PARISH OF CADDO*

**CLARK, J**., dissents in part for the reasons assigned by Justice Weimer.